In re ALLCAT CLAIMS SERVICE,
L.P. and John Weakly,
Relators.

No. 11–0589.

Supreme Court of Texas.

Argued Oct. 24, 2011.

Decided Nov. 28, 2011.

James F. Martens, Michael Boydstun Seay, Lacy L. Leonard, Amanda Marie Traphagan, Martens Seay & Todd, G.P., Austin TX, for Plaintiff.

Kevin D. Van Oort, Deputy Chief—Financial & Tax Litigation Div., Greg W. Abbott, Attorney General of Texas, Susan Combs, Texas Comptroller of Public Accounts, Danica Lynn Milios, Jonathan F. Mitchell, David C. Mattax, William J. "Bill" Cobb III, Bill Davis, Office of the Attorney General, Daniel Tekstar Hodge, First Asst. Attorney General, Austin TX, for Defendant.

George S. Christian, Texas Taxpayers and Research Association, Austin, TX, for Amicus Curiae Texas Taxpayers and Research Association.

Christopher S. Johns, Dawson & Sodd LLP, Austin, TX, for Amicus Curiae Nikki Laing, CPA.

Thomas Jensen Morgan, Texas Association of Realtors, Austin, TX, for Amicus Curiae Texas Association of Realtors.

Juan F. Vasquez Jr., Chamberlain Hrdlicka White Williams & Aughtry, Houston, TX, for Amicus Curiae Tyson Hoffer.

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice GUZMAN joined.

In this original proceeding Allcat Claims Service, L.P., a limited partnership, and one of its limited partners seek an order directing the Comptroller to refund franchise taxes Allcat paid that were attributable to partnership income allocated, but not distributed, to its natural-person partners. Allcat claims it is entitled to a refund for two reasons. First, the tax facially violates Article VIII, Section 24 of the Texas Constitution because it is a tax on the net incomes of its natural-person partners that was not approved in a statewide referendum. Second, as applied by the Comptroller to Allcat and its partners, the franchise tax violates Article VIII, Section 1(a) of the Constitution, which requires taxation to be equal and uniform. We hold that: (1) the tax is not a tax imposed on the net incomes of the individual partners, thus it does not facially violate Article VIII, Section 24; and (2) we do not have jurisdiction to consider the equal and uniform challenge.

## I. Background

### A. The Bullock Amendment and the Franchise Tax

In 1993 Texas voters adopted Article VIII, Section 24 of the Texas Constitution, frequently referred to as the Bullock Amendment.[1] *See* Tex. S.J. Res. 49, §§ 1–2, 73d Leg., R.S. (1993) (adopted Nov. 2, 1993). Section 24 provides in relevant part that

> [a] general law enacted by the legislature that imposes a tax on the net incomes of natural persons, including a person's share of partnership and unincorporated association income, must provide that the portion of the law imposing the tax not take effect until approved by a majority of the registered voters voting in a statewide referendum held on the question of imposing the tax.

Tex. Const. art. VIII, § 24(a).

A decade later a Travis County district court determined that the manner in which

---

1. So called after Lt. Gov. Bob Bullock who is widely credited with having taken the lead in authoring the amendment.

Texas funded its public schools was unconstitutional. *Neeley v. West Orange–Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 753–54 (Tex.2005). The court enjoined further state funding of the schools, but stayed the effect of its injunction until October 1, 2005, in order to give the Legislature time to cure the constitutional deficiencies. *Id.* The state defendants[2] appealed, and this Court was "[o]nce again ... called upon to determine whether the funding of Texas public schools violates the Texas Constitution." *Id.* at 751. We issued our opinion on November 22, 2005 and held that the State's system for financing public schools violated the Texas Constitution. We also changed the effective date of the district court's injunction to June 1, 2006. *Id.* at 796–99.

After the Travis County district court rendered its judgment in November 2004, and while the appeal was pending in this Court, the state actively worked on a different approach to funding public education. The 79th Legislature considered alternative methods of funding in its regular session and in two special sessions that lasted into August 2005. During this same period, the Governor also established the Texas Tax Reform Commission to study how to "modernize [Texas's] tax system and provide long-term property tax relief as well as sound financing for public schools." Press Release, Office of the Governor, Gov. Perry Names 24–Member Texas Tax Reform Commission (Nov. 4, 2005), *available at* http://governor.state.tx. us/news/appointment/5077/. The Commission held its first meeting the day before we issued *West Orange–Cove*.

In the months following our *West Orange–Cove* decision the Commission conducted hearings around the state.

Based on its study, research, and those hearings the Commission identified four main concerns with the State's tax system: (1) property taxes were too high; (2) taxes should be as broad and as low as possible; (3) schools should be the priority for state funding; and (4) the State's property taxes make it difficult to attract businesses without substantial incentives. *See* REPORT OF THE TEXAS TAX REFORM COMMISSION, *Tax Fairness: Property Tax Relief for Texans* 16 (2006), *available* at http://govinfo. library.unt.edu/ttrc/files/TTRC_report.pdf. The Commission's proposals included increasing the number of business forms subject to the franchise tax, which is the State's business tax. *Id.* at 18. The Commission noted that

> [f]or nearly a century the [franchise] tax has been applied to corporations. The original purpose of the franchise tax— and that which the Commission finds is still valid—was to collect a modest levy in return for the tremendous value afforded to businesses that chose to benefit from a state-provided liability shield. However, the recent spread of new business forms such as limited-liability partnerships have tapped the state's protections previously available only to corporations while avoiding the very levy designed to reflect the value of that protection. Tax-free status has thus been secured by many firms, to the competitive detriment of those remaining in corporate form.

*Id.*

As part of the effort to provide lasting property tax relief, establish a stable and long-term source of funding for public schools, and meet the June 1, 2006 deadline set in *West Orange–Cove*, the 79th

---

2. Hon. Shirley Neeley, Texas Commissioner of Education; the Texas Education Agency; Hon. Carole Keeton Strayhorn, Texas Comptroller of Public Accounts; and the Texas State Board of Education.

Legislature, in its third called session, enacted several amendments to the Texas Tax Code. *See* Act of May 2, 2006, 79th Leg., 3d C. S., ch. 1, §§ 1–27, 2006 Tex. Gen. Laws 1, 1–41 (the Act). The amendments were codified in Chapter 171 of the Tax Code and reflect many of the Commission's proposals, including its proposal to increase the number of business forms subject to the franchise tax. For the first time limited partnerships and certain other unincorporated associations were required to pay the tax. *See* Tex. Tax Code §§ 171.0002, 171.001. It is these amendments and their application that are the subject of this proceeding against the Comptroller and the Attorney General (collectively, the Comptroller).

### B. Allcat's Claims

Allcat Claims Service, L.P. is a Texas limited partnership that provides adjusting services to property insurers. It inspects damaged property to determine the cause of the damage and the costs of repair. Allcat's limited partners include relator, John Weakly. For tax years 2008 and 2009 Allcat paid franchise taxes under protest, then filed two suits seeking a refund: this original proceeding and a suit in the 201st District Court of Travis County. Here, Allcat seeks (1) an order requiring the Comptroller to refund that portion of the 2008 and 2009 franchise taxes it paid that are referable to its natural-person partners' shares of Allcat's income;[3] (2) a declaration that the franchise tax is unconstitutional to the extent it taxes partnership income allocable to its natural-person

partners; (3) an injunction directing the Comptroller not to assess, enforce, or collect the franchise tax to the extent it applies to Allcat's income allocated to its natural-person partners; and (4) a declaration that the Comptroller's interpretation of certain franchise tax provisions violates Allcat's right to equal and uniform taxation under the Texas Constitution. Allcat asserts the same equal and uniform taxation claim in the Travis County suit "to preserve the claim in the event this Court decline[s] to exercise jurisdiction over [it]."

The first basis on which Allcat and Weakly (collectively, Allcat) rely for relief, which we reference as the facial challenge, is that the amendments to the franchise tax statutes violate Section 24 of the Constitution because their effect is to impose an income tax on the net incomes of natural persons, despite the fact that the tax has not been approved in a statewide referendum. The second basis, which we reference as the as-applied challenge, is not that the franchise tax statutes are unconstitutional, but rather that the Comptroller's interpretation and application of them violate the equal and uniform taxation clause of the Texas Constitution. *See* Tex. Const. art. VIII, § 1. Allcat also seeks attorney's fees pursuant to the Declaratory Judgments Act (DJA). *See* Tex. Civ. Prac. & Rem.Code §§ 37.001–.011.[4]

### II. The Facial Challenge

#### A. Jurisdiction

 The jurisdiction of all Texas courts, including this Court, derives from

---

3. Allcat at first sought relief as to all of the taxes it paid. It later limited the relief it sought.

4. *Amicus* briefs supporting Allcat's position were submitted by Nikki Laing, CPA; Keller Haslett Storage Ltd.; Austin Analytical, LLC; Yacktman Asset Management Co.; NSBMA, LP; Cherry Creek Plaza Partnership Ltd.;

Nestle USA Inc.; the Corporate Housing Providers Association; Tyson Hoffer; Winning Investments, L.P.; and Winning Management, L.L.C. *Amicus* briefs supporting the Comptroller were submitted by the Texas Taxpayers and Research Association and the Texas Association of Realtors.

the Texas Constitution and state statutes. *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex.1996) (per curiam). Absent an express constitutional or statutory grant, we lack jurisdiction to decide any case. *Id.*

The Constitution is silent about taxpayer suits, but Texas statutes have long vested our courts with the responsibility to adjudicate these disputes. Under applicable statutory provisions, which are not challenged by Allcat, taxpayer suits contesting either (1) the validity of a state tax or (2) the authority of the public official charged with the assessment, enforcement, or collection of the tax, must be brought in a Travis County district court. *See, e.g.,* TEX. TAX CODE §§ 112.001 ("The district courts of Travis County have exclusive, original jurisdiction of a taxpayer suit brought under this chapter."); *id.* § 112.051 (requiring that a person must pay the tax in question before bringing a suit "contend[ing] that the tax or fee is unlawful or that the public official charged with the duty of collecting the tax or fee may not legally demand or collect the tax or fee"); *id.* § 112.101(a) (providing that injunctive relief may be issued against the Comptroller prohibiting her assessment or collection of a tax). In contrast to the general provisions of the Tax Code prescribing jurisdiction for taxpayer suits, the Act gives this Court original and exclusive jurisdiction over constitutional challenges to the franchise tax amendments:

> The supreme court has exclusive and original jurisdiction over a challenge to the constitutionality of this Act or any part of this Act and may issue injunctive or declaratory relief in connection with the challenge.

*See* Act § 24. We first address the Legislature's conferral of original jurisdiction on this Court.

Allcat argues that section 24 is a valid exercise of legislative authority under Article V, Section 3(a) of the Constitution and that the Court has statutory authority to issue certain extraordinary writs under section 22.002(c) of the Government Code. The Comptroller does not contest our jurisdiction but posits that to accept jurisdiction under Article V, Section 3(a), we must first overrule our decisions in *Love v. Wilcox*, 119 Tex. 256, 28 S.W.2d 515 (1930) and *Lane v. Ross*, 151 Tex. 268, 249 S.W.2d 591 (1952). She disagrees with Allcat's contention that section 22.002(c) is a valid source of our jurisdiction. For the reasons expressed below, we hold that we have jurisdiction under Article V, Section 3(a)[5] and that neither *Love* nor *Lane* stand as impediments.

The Constitution of 1891 gave the Supreme Court three types of jurisdiction: appellate jurisdiction, jurisdiction to issue writs, and original jurisdiction. The Court's appellate jurisdiction was described as follows:

> The Supreme Court shall have appellate jurisdiction only except as herein specified, which shall be coextensive with the limits of the State. Its appellate jurisdiction shall extend to questions of law arising in cases of which the Courts of Civil Appeals have appellate jurisdiction under such restrictions and regulations as the Legislature may prescribe. Until otherwise provided by law the appellate jurisdiction of the Supreme Court shall extend to questions of law arising in the cases in the Courts of Civil Appeals in which the Judges of any Court of Civil Appeals may disagree, or where the several Court of Civil Appeals may hold differently on the same question of law

---

5. The Comptroller also suggests that Article V, Section 8 may authorize the Legislature to confer original jurisdiction on this Court. We need not address that position.

or where a statute of the State is held void.

TEX. CONST. art. V, § 3 (1891). The next sentence described the Court's writ jurisdiction:

The Supreme Court and the Justices thereof shall have power to issue writs of habeas corpus, as may be prescribed by law, and under such regulations as may be prescribed by law, the said courts and the Justices thereof may issue the writs of mandamus, procedendo, certiorari and such other writs, as may be necessary to enforce its jurisdiction.

*Id.* Section 3 then described the Court's original jurisdiction:

The Legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except as against the Governor of the State.

*Id.*

In *Love* we held that the sentence last quoted limited the Legislature's authority to confer original jurisdiction on the Court. 28 S.W.2d at 522. The statute involved in that case attempted to give the Court "the power, or authority, or jurisdiction, to issue the Writ of Mandamus, or any other Mandatory or compulsory Writ or Process" against certain political party officials. *Id.* We concluded that "the Consti-

tution limits the original jurisdiction of the court to the issuance of writs of quo warranto and mandamus," and that "so much of the legislative act under examination as attempts to confer upon the Supreme Court the power to issue 'any other mandatory or compulsory writ or process' save the writ of mandamus, is violative of the Constitution, and is therefore void."[6] *Id.* The Court reaffirmed *Love* in *Lane,* 249 S.W.2d at 593.

In 1981, Article V was amended, principally to confer jurisdiction over criminal appeals on the Courts of Civil Appeals, changing them to the Courts of Appeals. Act of May 25, 1979, 66th Leg., R.S., S.J. Res. No. 36, § 3 (adopted at Nov. 4, 1980 election). Section 3 was also amended to its current form. *Id.* The first sentence referring to appellate jurisdiction was replaced by these two, describing the Court's jurisdiction generally:

The Supreme Court shall exercise the judicial power of the state except as otherwise provided in this Constitution. Its jurisdiction shall be coextensive with the limits of the State and its determinations shall be final except in criminal law matters.

TEX. CONST. art. V, § 3(a). The other two lengthy sentences of the prior provision

---

6. We also noted that there were other limitations on the Legislature's authority to confer original jurisdiction on the Supreme Court:

This court has heretofore laid down certain limitations on the power of the Legislature to specify classes of cases which may be brought within the court's original jurisdiction. One is that the right to the duty required to be performed by mandamus shall not be 'dependent upon the determination of any doubtful question of fact.' *Teat v. McGaughey,* 85 Tex. 486, 487, 22 S.W. 302, 303 [(1893)]. Another limitation is that the writ of quo warranto or mandamus be a proper or necessary process for enforcement of the right asserted.

*Pickle v. McCall,* 86 Tex. 218, 24 S.W. 265 [(1893)]. A third is there must be some strong and special reason for the exercise of this extraordinary original jurisdiction by a court designed primarily as the court for the correction by appellate review of errors of inferior courts in determining questions of law. In this connection, the court found no objection to the Legislature requiring it to exercise original jurisdiction by mandamus, where the proceeding 'involves questions which are of general public interest and call for a speedy determination.' *Betts v. Johnson,* 96 Tex. 363, 73 S.W. 4, 5 [(1903)].

28 S.W.2d at 519.

describing the Court's appellate jurisdiction became one short one:

> Its appellate jurisdiction shall be final and shall extend to all cases except in criminal law matters and as otherwise provided in this Constitution or by law.

*Id.* The provisions describing the Court's writ jurisdiction and original jurisdiction were not changed.

■ The provision at issue in this case provides that the Court "has exclusive and original jurisdiction over a challenge to [its] constitutionality." Act § 24. It also authorizes the Court to "issue injunctive or declaratory relief in connection with the challenge." *Id.* If the grant of jurisdiction or the relief authorized in the statute exceeds the limits of Article V, Section 3(a), then we simply exercise as much jurisdiction over the case as the Constitution allows, as we did in *Love. See* 28 S.W.2d at 522. But, in *Lane,* we held that while "this court has no original jurisdiction to issue a writ of injunction .... [i]n cases in which this court's jurisdiction to issue a writ of mandamus has attached the court necessarily has the correlative authority to issue a writ of injunction to make the writ of mandamus effective." 249 S.W.2d at 593. The same may be said of declaratory relief.

The Act clearly expresses legislative intent that the Court consider the constitutionality of its provisions. In this matter, mandamus is a "proper or necessary process for enforcement of the right asserted" because Allcat seeks an order directing the Comptroller to refund part of the taxes it paid. *Love,* 28 S.W.2d at 519. That being so, we necessarily have the correlative authority to provide declaratory and injunctive relief as appropriate.

The Comptroller argues that this suit cannot be considered a mandamus proceeding over which the Court has original jurisdiction under Article V, Section 3(a)

because mandamus relief would never be appropriate. She contends that an official does not abuse her discretion by enforcing a statute that is later determined to be unconstitutional. But in *LeCroy v. Hanlon,* 713 S.W.2d 335 (Tex.1986), we affirmed a judgment declaring a filing fee statute unconstitutional, granting mandamus relief against the district clerk, and issuing injunctive relief precluding the clerk from charging the unconstitutional filing fee. *Id.* at 337, 343; *see also Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147, 156 (1942) (mandamus issued directing the Comptroller to issue pay warrants after he refused to issue them based on his improper interpretation of the Constitution). In this matter, if Allcat is correct and the Act is unconstitutional, then the Act does not provide legal authority for the Comptroller to retain the taxes and Allcat will be entitled to mandamus directing a refund.

The Comptroller argues that if mandamus relief is appropriate in cases such as this, then any constitutional challenge can be brought initially in this Court. But as we explained in *Love* and *Lane,* Article V, Section 3(a) imposes a limit: legislative authorization and mandamus being a proper or necessary process for enforcement of the right asserted. For example, in a case the Comptroller cites, *Chenault,* the relators brought an original mandamus proceeding seeking "a declaration that the attorney occupation tax is unconstitutional, an injunction against the officials responsible for collecting the tax, and writs prohibiting enforcement of the tax." 914 S.W.2d . at 141. The Court refused to consider the constitutional arguments, stating that "this action is not within the original jurisdiction granted to this Court by either the Texas Constitution or the Legislature." *Id.*

We conclude that section 24 of the Act serves as a specific, limited exception to the generalized provisions of the Tax Code

that confer exclusive jurisdiction over suits such as Allcat's on the district courts of Travis County; it does not violate Article V, Section 3(a); and it gives this Court original, exclusive jurisdiction to consider the facial challenge to the Act's constitutionality in order to determine whether mandamus should issue directing the Comptroller to refund taxes that Allcat paid under protest. We need not and do not address other arguments advanced by the parties regarding our jurisdiction over the facial challenge.

## B. Is the Tax Constitutional?

 As an initial matter, we note Allcat contends that only Texas law applies to the issues presented. We agree. The Bullock Amendment and Texas partnership law, not some other law such as the federal Internal Revenue Code (IRC), control whether the Act violates the Texas Constitution.

Allcat insists that the franchise tax is, in effect, an income tax notwithstanding the Legislature's express statement to the contrary. *See* Act § 21 ("The franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is not an income tax...."). It reasons that because the income of a partnership is allocated to each partner according to the partner's partnership interest, the Act taxes each partner's allocated share of Allcat's income. Allcat asserts that, in this manner, the franchise tax is a tax on the net incomes of its partners and violates the Bull-

ock Amendment as to partners who are natural persons.

The Comptroller counters that the franchise tax is not an income tax because it can result in taxes due even if the entity loses money. She further argues that whether the tax is an income tax is irrelevant because Texas has adopted the entity theory for partnership law and a tax imposed on a limited partnership entity does not constitute a tax on the net incomes of the partnership's individual partners. Because it is dispositive, we begin with the Comptroller's second argument.

Under the aggregate theory of partnership law a partnership is not an entity separate and distinct from its individual partners. Rather, the "partnership" name or label is a convenient way of referring to the partners as a group. *See* 1 ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 1.03(a)–(b) (Release No. 31, 2011–12 Supp.). In contrast, under the entity theory of partnership law the partnership is an entity separate and distinct from its partners.[7] *Id.*

Although it has not always been so, Texas adheres to the entity theory. In 1961 the Legislature adopted the Texas Uniform Partnership Act (TUPA), TEX. CIV. STAT. ANN. art. 6132(b) which "lean[ed] heavily toward the entity idea." *Id.*, § 1, cmt. This Court recognized that the aggregate theory had been abandoned for most purposes with the TUPA's adoption:

---

7. The practical application of these different approaches yields various consequences. For example, which theory a state embraces for its partnership law—aggregate or entity—can be determinative of whether a partner may be liable for embezzlement or improper use of partnership property. *Compare In re Leal,* 360 B.R. 231, 239–41 (Bankr.S.D.Tex.2007) (applying Texas partnership law to conclude that a partner was liable to the partnership for conversion of partnership property be-

cause he did not have an individual interest in such property), *with State v. Birch,* 36 Wash. App. 405, 675 P.2d 246 (1984) (upholding the trial court's dismissal of charges for embezzling partnership funds and providing that whether a state follows an aggregate or entity theory of partnership law is for the Legislature to decide). *See generally* BROMBERG at § 1.03(c) (identifying the aggregate and entity aspects of partnership law in specific areas).

[under the aggregate theory] a partnership was considered to be an aggregate of individuals acting under contract.... However, after the adoption of [TUPA], a partnership was recognized as an entity legally distinct from its partners for most purposes. The entity theory of partnership is consistent with other laws permitting suit in the partnership name and service on one partner.

*Haney v. Fenley, Bate, Deaton & Porter,* 618 S.W.2d 541, 542 (Tex.1981) (per curiam). Yet despite the TUPA, some courts continued to apply the aggregate theory in certain situations. *See, e.g., Lawler v. Dallas Statler–Hilton Joint Venture,* 793 S.W.2d 27, 33–34 (Tex.App.-Dallas 1990, writ denied) (recognizing that Texas is "predominantly an entity theory state" but determining that under the TUPA there were sufficient aggregate features to a partnership for the court to apply the aggregate theory to an employment relationship).

Courts' application of the aggregate theory in certain contexts and the entity theory in others led to some confusion. So, "to allay previous concerns that stemmed from confusion as to whether a partnership was an entity or an aggregate of its members," the 73rd Legislature passed the Texas Revised Uniform Partnership Act (TRPA) in 1993 and thereby "unequivocally embrace[d] the entity theory of partnership by specifically stating ... that a partnership is an entity distinct from its partners." Tex.Rev.Civ. Stat. Ann. art. 6132b–2.01, Comment of Bar Committee—1993. The TRPA, codified in the Texas Business Organizations Code, plainly provides that

"[a] partnership is an entity distinct from its partners," and "[a] partner is not a co-owner of partnership property." Tex. Bus. Orgs.Code §§ 152.056, 154.001(c). Further, it is the partnership interest that is a partner's "personal property for all purposes." *Id.* § 154.001(a); *see also Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.,* 337 S.W.3d 846, 855 (Tex.2011) (noting that the general partner of a limited partnership is not an owner of the limited partnership's property). The same Legislature that adopted the TRPA also adopted the language in the Bullock Amendment. *See* Tex. S.J. Res. 49, §§ 1–2, 73d Leg., R.S. (1993) (adopted Nov. 2, 1993).[8]

In *Kao Holdings, L.P. v. Young,* 261 S.W.3d 60 (Tex.2008), we distinguished early Texas law that rejected the entity theory from modern practice. In doing so we quoted the following language from *Frank v. Tatum*:

> It is a general rule that suits in courts can only be maintained by and against persons natural or artificial; that is, individuals or corporations. Unless otherwise provided by statute, a copartnership is not considered a person, and must sue and be sued by its members.... The rule that a copartnership must sue or be sued by its members is so universally recognized that there is no need for discussion.

*Id.* at 62 n. 9 (quoting 87 Tex. 204, 25 S.W. 409, 409–10 (1894)). We then contrasted that view with more current law under which a partnership is an entity separate from the partners:

> the language of the Bullock Amendment pursuant to Senate Joint Resolution 49 on April 27, 1993 and adopted the related conference committee report on May 27, 1993. The House adopted Senate Joint Resolution 49 with amendments on May 21 and the conference committee report on May 28.

**8.** The TRPA originated in the 73rd Legislature as H.R. 273. The House passed H.R. 273 on April 19, 1993 and adopted the conference committee report on May 30. The Senate passed H.R. 273 with amendments on May 18 and adopted the conference committee report on May 29. Meanwhile, the Senate adopted

In *M Sys. Stores, Inc. v. Johnston*, 124 Tex. 238, 76 S.W.2d 503, 504 (1934), we reiterated that "a partnership is not a legal entity, like a corporation." Much later, in *Haney v. Fenley, Bate, Deaton & Porter*, 618 S.W.2d 541, 542 (Tex. 1981), we observed that "after the adoption of the Texas Uniform Partnership Act, Tex.Rev.Civ. Stat. Ann. art. 6132b, effective January 1, 1962, a partnership was recognized as an entity legally distinct from its partners for most purposes." *See also* Tex.R. Civ. P. 28 ("Any partnership . . . may sue or be sued in its partnership, assumed or common name for the purpose of enforcing for or against it a substantive right. . . .").

*Id.*

Allcat urges that the separate entity concept applies only in contexts unrelated to net income, such as property ownership and enforcement of liability. Citing *Destec Energy, Inc. v. Houston Lighting & Power Co.*, 966 S.W.2d 792 (Tex.App.-Austin 1998, no pet.), it argues that Texas has not adopted the entity approach for partnership income, thus partnership income is divided into shares essentially owned by the partners regardless of whether the income shares are actually distributed to the partners. We disagree with Allcat's position and its reading of *Destec*. In *Destec* the court of appeals rejected the aggregate theory of partnership law in deference to the Legislature's adoption of the entity theory in the TRPA. *Id.* at 795–96. That same court recently reviewed the nature of partnership income under the entity theory. *See Smith v. Grayson*, No. 03–10–00238–CV, 2011 WL 4924073, at *5–*6 (Tex.App.-Austin Oct. 12, 2011, no pet. h.). In determining whether partnership earnings retained by the partnership are separate property of a limited partner or community property of the partner and his wife, the court noted that "[p]artnership earnings are owned by the partnership prior to distribution to the partners and cannot be characterized as either separate or community property." *Id.* at *6. Rather, the limited partner's "right to receive his share of the profits is the only partnership right subject to characterization." *Id.* at *5.

Other courts of appeals have likewise rejected attempts to impose an aggregate theory of partnership law, given the express language of the TRPA. *See, e.g., Bexar Appraisal Dist. v. Am. Opportunity for Housing–Perrin Oaks, L.L.C.*, No. 04–10–00278–CV, 2010 WL 4978099, at *3–*5 (Tex.App.-San Antonio Dec. 8, 2010, no pet.) (applying the entity theory to distinguish between the partnership and its partners to determine who could protest the rejection of the tax exempt status of certain property); *Simmons, Jannace & Stagg, L.L.P. v. Buzbee Law Firm*, 324 S.W.3d 833 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (holding that a partnership law firm could not appear *pro se*); *Alice Leasing Corp. v. Castillo*, 53 S.W.3d 433, 443 (Tex.App.-San Antonio 2001, pet. denied) (recognizing that "the Legislature unequivocally embraced the entity theory of partnership law in 1993").

Allcat also argues that section 152.202(a) of the Business Organizations Code (entitled "Credits of and Charges to Partner") should control over section 152.056 (entitled "Partnership as Entity"), thereby making partnership income an exception to the separate entity concept. Section 152.202(a) provides in relevant part: "Each partner is credited with an amount equal to . . . the partner's share of the partnership's profits." Tex. Bus. Orgs. Code § 152.202(a). This provision, when read in context with section 153.206, providing how limited partnership profits and losses are allocated, merely specifies that partnership profits are credited and allo-

cated to the partner's partnership interest according to the partnership agreement or as otherwise provided under the TRPA. Tex. Bus. Orgs.Code § 152.202(a), 153.206; *see also id.* § 153.003 (providing that the provisions of chapter 152 apply to limited partnerships if they are not inconsistent with chapter 153 of the TRPA).[9] The TRPA provides that partners have creditors' rights in regard to distributions of partnership profits, but it does not provide that allocations of partnership profits are property of, subject to the control of, or income to the separate partners. *See* Tex. Bus. Orgs.Code § 153.207–.210; *see also Smith*, 2011 WL 4924073, at *5–*6; *Cleaver v. Cleaver*, 935 S.W.2d 491, 495 (Tex. App.-Tyler 1996, no writ). And the right to receive a distribution, even assuming it is authorized by the partnership, is subject to the partnership's ability to satisfy its liabilities. *See* Tex. Bus. Orgs.Code § 153.210 (providing that distributions may not be made if, immediately after giving effect to the distribution, liabilities of the partnership will exceed the fair value of the partnership assets); *see also* Tex. Bus. Orgs.Code § 153.105 (providing that rights of limited partners may be created only by (1) the certificate of formation; (2) the partnership agreement; (3) other sections of chapter 153; or (4) the other limited partnership provisions). Thus, under Texas law the allocation of partnership income or profits to a partner does not convert the amounts allocated into property of or income to the partner, and section 152.202(a) does not indicate a departure from the entity theory.

In support of its position, Allcat also references matters extraneous to the legislative history of the Bullock Amendment.

Some of these pre-date and some post-date enactment of the Amendment. The most relevant are exemplified by a 1991 letter sent to then-Governor Ann Richards by twenty-two members of the senate. The letter stated that "[a] tax on partnership income ... is really a tax on personal income that only applies to some persons." Letter from Members of the Texas Senate to Governor Ann Richards, *et al.,* (Jul. 23, 1991) (on file with Baylor University's Collections of Political Materials). This position, Allcat urges, provides the context in which the Amendment was adopted.

■ We agree that the Bullock Amendment must be construed in light of conditions existing at the time it was adopted. *See City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex.1995); *Jones v. Ross,* 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943). However, in construing the Texas Constitution, we " 'ascertain and give effect to the plain intent and language of the framers of a constitutional amendment and of the people who adopted it.' " *Wilson v. Galveston Cnty. Cent. Appraisal Dist.,* 713 S.W.2d 98, 101 (Tex.1986) (quoting *Gragg v. Cayuga Indep. Sch. Dist.,* 539 S.W.2d 861, 866 (Tex.1976)). We presume the language of the Constitution was carefully selected, interpret words as they are generally understood, and rely heavily on the literal text. *See Harris Cnty. Hosp. Dist. v. Tomball Regional Hosp.,* 283 S.W.3d 838, 842 (Tex.2009) (citing *Stringer v. Cendant Mort. Corp.,* 23 S.W.3d 353, 355 (Tex.2000) and *Bouillion,* 896 S.W.2d at 148).

As we have often held, however, the most relevant consideration in construing a

---

**9.** Allcat's partnership agreement is not in the record. Neither party argues that its relevant terms differ from the TRPA's provisions. *See* Tex. Bus. Orgs.Code § 152.002 ("To the extent that the partnership agreement does not oth-

erwise provide, this chapter and the other partnership provisions govern the relationship of the partners and between the partners and the partnership.").

constitutional or statutory provision is its text. The permutations placed on that text by others, even those who urge its adoption, must ordinarily yield when the text's plain meaning says the opposite. Political advocacy may influence votes on important legislative initiatives, but it cannot control a court's ultimate responsibility to decide the law that was finally enacted or adopted. Here, the letter to Governor Richards represents senators' opinions almost two years before the Legislature adopted the TRPA and approved the Bullock Amendment's language and submitted it to Texans for adoption. It represents but a subset of the Legislature and states views that may have changed in the two-year period of debate preceding the enactment of the TRPA and the submission of the Amendment to the voters. Indeed every one of the signatories who were still senators in the 73rd Legislature voted in favor of the TRPA. The passage of time, in conjunction with the plain language of the TRPA's text, forecloses any argument that the Legislature rejected any aspect of the entity theory of partnership law.

The materials Allcat references reflect a disdain for a state income tax on natural persons, absent voter approval, but none of the materials contradicts legislative intent to tax partnerships under the entity theory. The caption of Senate Joint Resolution 49 stated that the resolution "[p]ropos[ed] a constitutional amendment prohibiting a personal income tax without voter approval and dedicating the proceeds of the tax, if enacted, to education and property tax relief," and when the proposed amendment was submitted to the voters, it was described as "Proposition 4: The constitutional amendment prohibiting a personal income tax without voter approval and, if an income tax is enacted, dedicating the revenue to education and limiting the rate of local school taxes." Tex. S.J. Res. 49, 73d Leg., cap-

tion, § 3 (1993). The language is not ambiguous and, as such, opinions from senators, newspapers, or other sources cannot override the text approved by the Legislature. *See Tex. Dept. of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 117–18 (Tex.2011) (recognizing that the Legislature's intent is best manifested by what it enacts); *Molinet v. Kimbrell,* 356 S.W.3d 407 (Tex.2011) ("Statements made during the legislative process by individual legislators or even a unanimous legislative chamber are not evidence of the collective intent of the majorities of both legislative chambers that enacted a statute.... The Legislature expresses its intent by the words it enacts."); *AT & T Commc'ns of Tex., L.P. v. Sw. Bell Tel. Co.,* 186 S.W.3d 517, 528–529 (Tex.2006) ("[T]he statement of a single legislator, even the author and sponsor of the legislation, does not determine legislative intent."). Nor do they reflect intent by the voters to adopt something other than a constitutional amendment prohibiting a personal income tax without voter approval, and providing that if a personal income tax were to be enacted, revenues from it must be dedicated to education. Accordingly, we read the TRPA as stating without equivocation that partnership income remains property of the partnership entity until it is distributed.

Allcat further argues that the Bullock Amendment extends to instances in which a natural person's partnership income is taxed "indirectly." Allcat urges that the Bullock Amendment's partnership clause—"including a person's share of partnership and unincorporated association income"—becomes meaningless if it applies only when the franchise tax statute results in direct taxation of a partner for some part of partnership income, as is the case in the federal taxation scheme. *See* 26 U.S.C. § 701 ("A partnership as such

shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities."). The substance of Allcat's argument is that regardless of whether Texas classifies partnership income and profits as partnership property (the entity theory) or property of the partners (the aggregate theory), the Bullock amendment constitutionally transforms a natural-person partner's allocated share of partnership income into part of the person's "net income" and forbids applying the tax at either the partnership or individual level absent approval in a referendum. Again, we disagree.

■ When construing statutes we presume the Legislature intended them to comply with the Texas Constitution. TEX. GOV'T CODE § 311.021; *see also Proctor v. Andrews*, 972 S.W.2d 729, 735 (Tex.1998) (" 'Statutes are given a construction consistent with constitutional requirements, when possible, because the legislature is presumed to have intended compliance with [the Constitution].' " quoting *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex.1990)). And as previously noted, in construing amendments to the Texas Constitution we ascertain and give effect to the plain intent and language of the framers of the amendments and of the people who adopted them, beginning with and giving primacy to the language that was adopted. *See Wilson*, 713 S.W.2d at 101; *Gragg*, 539 S.W.2d at 866.

To review, Section 24(a) of the Constitution provides that voters must approve "[a] general law enacted by the legislature that imposes a tax on the net incomes of natural persons, including a person's share of partnership and unincorporated association income" before it becomes effective. TEX. CONST. art. VIII, § 24(a). The reference to partnership and unincorporat-

ed association income is an explanatory phrase modifying the phrase "the net incomes of natural persons." *Id.; see also* TEX. GOV'T CODE § 311.005(13) (defining the term "including" under the Code Construction Act as a term of enlargement). Allcat's argument proposes that the amount of partnership income allocated to a partner becomes the partner's "share" of partnership income once it is allocated, regardless of Texas law and regardless of whether partnership operations, expenses or losses were to later reduce the allocated amount. That argument would have weight if the partnership were not a separate entity, but it is. Allcat does not argue that the TRPA violates either the Bullock Amendment or some other constitutional provision by making the partnership and its income an entity separate from its partners. Nor does Allcat argue that either the Bullock Amendment or some other constitutional provision restricts Texas to particular taxation methodologies such as ones conforming to the federal income tax system.

Simply put, under Texas law the entity theory applies to partnership income and profits. Individual partners do not own any of either while they remain in the partnership's hands and have not been distributed to the partners. *See, e.g.,* TEX. BUS. ORG.CODE § 152.056; *see also Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex.2010) ("[W]e must take statutes as we find them and first and primarily seek the Legislature's intent in its language."). And while a partner's interest in the partnership represents the right to receive the partner's share of partnership profits when they are distributed, it does not follow that for purposes of the Texas franchise tax such right constitutes a partner's "share" of any partnership income or profits while the partnership retains the income and profits

without having distributed any of them to the partner.[10]

The Bullock Amendment prohibits the State from implementing, without voter approval, an income tax on the net incomes of natural persons, including a tax scheme yielding results similar to those of the federal income tax construct as related to partnerships. Under the federal construct, partnership income "flows through" to and is taxed to the partner. The IRC does not tax partnerships as entities, *see* 26 U.S.C. § 701, but instead taxes only the partners and defines a partner's gross income as including "his distributive share of the gross income of the partnership." 26 U.S.C. § 702(c). The federal law flow-through approach to partnership income "certainly represents the aggregate view [of partnerships]." Bromberg at 1.03(c)(9). Chapter 171 of the Tax Code does not adopt the tax scheme of the IRC even though it draws from entries on certain federal tax forms as its method for determining the amount of franchise taxes a business owes.[11] Allcat's position flies di-

---

**10.** The Comptroller argues that use of the term "net income" shows that the Legislature is not prohibited from passing a tax on the gross incomes of natural persons. She suggests that to the extent a person's share of partnership income is income at all, it merely amounts to a portion of the person's "gross income" which is not the subject of the Bullock Amendment. The parties and *amici* advance competing arguments about whether the franchise tax is an income tax. They cite authorities concluding that it is and authorities concluding that it is not. For those concluding that it is not see Ga. Dep't of Rev., Individual FAQs, *available at* https://etax.dor.ga.gov/inctax/webfaq/faq-ind.aspx# texasmargin (last visited Nov. 16, 2011); Instructions for Maine Corporate Income Tax 2010 Form 1120ME, Line 4a, at 4, *available at* http://www.maine.gov/revenue/forms/corporate/2010/10_1120inst.pdf; Mass. Dep't of Rev., Directive No. 08–7 (Dec. 18, 2008); Minn. Rev. Notice No. 08–08 (Jul. 21, 2008); Pa. Dep't of Rev., Corp. Tax Bulletin 2008–05, (Dec. 1, 2008), *available at* http://pa.gov/portal/server.pt/document/910228/ct_bulletin_2008-05_pdf; Va. Tax Comm'r Ruling, Pub. Doc. No. 08–169 (Sept. 11, 2008). For those concluding that it is see Cal. Franchise Tax Bd., Technical Advice Mem.2011–03 (Apr. 13, 2011), *available at* http://www.ftb.ca.gov/law/Technical_Advice_Memorandums/2011/20110003.pdf; Kans. Dep't of Rev., Opinion Letter No. O–2008–004 (Sept. 2, 2008), *available at* http://rvpolicy.kdor.state.ks.gov/Pilots/Ntrntpil/IPILv1x0.NSF/ae2ee39f7748055f8625655b004e9335/e861583bab1caf27862574ba005eb8c3?OpenDocument (last visited Nov. 16, 2011); Mo. Dep't of Rev. Letter Ruling LR 5309 (Dec. 12, 2008), *available at* http://dor.mo.gov/rulings/show.php?num=5309 (last visited Nov. 16, 2011); S.C. Dep't of Rev., Rev. Rul. 09–10 (Jul. 17, 2009), *available at* http://www.sctax.org/NR/rdonlyres/B8314617-023F-4575-9C96-D9449EE53AAF/0/RR0910.pdf; Wisc. Tax Bulletin 156 at 7 (April 2008); Minutes of the August 2, 2006, Board Meeting on Potential FSP: Texas Franchise Tax, at 2–3, *available at* http://www.fasb.org/jsp/FASB/Page/08-02-06_texas_franchise_tax.pdf. Because the arguments do not affect our analysis, we do not address them.

**11.** *See* Tex. Tax Code § 171.1011. With respect to partnerships this section provides:
(c) Except as provided by this section, and subject to Section 171.1014, for the purpose of computing its taxable margin under Section 171.101, the total revenue of a taxable entity is: . . . .
(2) for a taxable entity treated for federal income tax purposes as a partnership, an amount computed by:
(A) adding:
(i) the amount reportable as income on line 1 c, Internal Revenue Service Form 1065;
(ii) the amounts reportable as income on lines 4, 6, and 7, Internal Revenue Service Form 1065;
(iii) the amounts reportable as income on lines 3a and 5 through 11, Internal Revenue Service Form 1065, Schedule K;
(iv) the amounts reportable as income on line 17, Internal Revenue Service Form 8825;
(v) the amounts reportable as income on line 11, plus line 2 or line 45, Internal Revenue Service Form 1040, Schedule F; and
(vi) any total revenue reported by a lower tier entity as includable in the taxable

rectly in the face of the TRPA's specification that partnership profits and losses are allocated to partners as a component of that partner's partnership interest and the partner's rights to a distribution from that property interest are limited to those of a creditor. TEX. BUS. ORGS.CODE §§ 152.202(a), 153.206–.207, 154.001(a). We reject it. The Bullock Amendment does not preclude the taxation of business entities for the privilege of doing business in Texas and taking advantage of the option to limit the liability of the owners of a business as Allcat does by means of the limited partnership structure.

We conclude that the franchise tax constitutes a tax on Allcat as an entity; it does not constitute a tax on the net income of Allcat's natural-person limited partners within the meaning of the Bullock Amendment. We hold that Allcat's facial challenge is without merit.

### III. The As–Applied Challenge

Allcat does not directly attack the provisions of the Act by its as-applied challenge, but instead claims that the Comptroller's interpretation and enforcement of the franchise tax statutes violates its rights under the equal and uniform taxation clause of Article VIII, Section 1 of the Constitution. In other words, by its as-applied claim Allcat challenges the Comptroller's assessment, enforcement, and collection of the tax imposed by the Act. As

we did with the facial challenge, we first address our jurisdiction.

Allcat's claim is subject to chapter 112 of the Tax Code which generally vests exclusive jurisdiction over tax suits in the district courts of Travis County. *See, e.g.,* TEX. TAX.CODE §§ 112.001, 112.051–.053, 112.101–.1011. As it does in its facial challenge, Allcat asserts that section 24 of the Act withdraws its claim from the Travis County courts' jurisdiction and provides this Court with exclusive, original jurisdiction. In the alternative, it asserts that this Court has jurisdiction under the statutory jurisdiction afforded by section 22.002(c) of the Government Code. We first address the argument regarding section 24 of the Act.

We held in section IIA that section 24 of the Act constitutes a specific, limited exception to the general grant of jurisdiction in the district courts of Travis County, *see* TEX. GOV'T CODE § 311.026(b) (specifying that specific statutory provisions prevail over general ones in statutory construction), and is a valid legislative conferral of jurisdiction under Article V, Section 3(a) of the Constitution. Assuming, without deciding, that Section 3(a) authorizes the Legislature to confer original jurisdiction on this Court for an as-applied challenge, section 24 of the Act only confers original jurisdiction over challenges to the constitutionality of the Act. It does not

entity's total revenue under Section 171.1015(b); and
(B) subtracting:
(i) bad debt expensed for federal income tax purposes that corresponds to items of gross receipts included in Subsection (c)(2)(A) for the current reporting period or a past reporting period;
(ii) to the extent included in Subsection (c)(2)(A), foreign royalties and foreign dividends, including amounts determined under Section 78 or Sections 951–964, Internal Revenue Code;

(iii) to the extent included in Subsection (c)(2)(A), net distributive income from a taxable entity treated as a partnership or as an S corporation for federal income tax purposes;
(iv) to the extent included in Subsection (c)(2)(A), items of income attributable to an entity that is a disregarded entity for federal income tax purposes; and
(v) to the extent included in Subsection (c)(2)(A), other amounts authorized by this section. . . .
TEX. TAX CODE § 171.1011(c)(2).

authorize this Court to exercise original jurisdiction over challenges to how the Comptroller assesses, enforces, or collects the franchise tax. Thus, section 24 of the Act does not confer original jurisdiction on this Court over Allcat's as-applied challenge. *See Chenault,* 914 S.W.2d at 141.

 Next, we address Allcat's argument that section 22.002(c) of the Government Code gives this Court original jurisdiction. Section 22.002(c) provides

> Only the supreme court has the authority to issue a writ of mandamus or injunction, or any other mandatory or compulsory writ or process, against any of the officers of the executive departments of the government of this state to order or compel the performance of a judicial, ministerial, or discretionary act or duty that, by state law, the officer or officers are authorized to perform.

TEX. GOV'T CODE § 22.002(c). To support its assertion Allcat cites *In re Smith,* 333 S.W.3d 582 (Tex.2011), and *A & T Consultants, Inc. v. Sharp,* 904 S.W.2d 668 (Tex. 1995). In those cases the Court determined it had jurisdiction because controlling statutes that expressly authorized mandamus relief did not state which court had jurisdiction to issue the writ against a state executive officer. *See In re Smith,* 333 S.W.3d at 585 (citing TEX. CIV. PRAC. & REM.CODE § 103.051(e)); *A & T,* 904 S.W.2d at 672 (citing former TEX. GOV'T CODE § 552.321, *amended by* Act of May 23, 1999, 76th Leg., ch. 1319, § 27 (adding a provision specifying the court in which a suit for writ of mandamus must be filed)). In this case, however, the Tax Code expressly provides not only which courts have jurisdiction to provide relief in taxpayer challenges—the district courts of Travis County—but also addresses whether those courts are authorized to provide mandamus or other similar relief. *See* TEX. TAX CODE §§ 112.001, 112.108.[12]

Moreover, even if section 22.002(c) of the Government Code empowered this Court to exercise original jurisdiction over Allcat's as-applied challenge, the more detailed, specific construct of the Tax Code would apply over section 22.002(c)'s general provisions and limitations. *See* TEX. GOV'T CODE § 311.026 (providing that if statutes conflict, "the special or local provision prevails as an exception to the general provision"); *see also A & T,* 904 S.W.2d at 672 ("Any exception to [section 22.002(c) of the Government Code] would require express statutory authorization by the legislature."). And section 24 of the Act is not an exception to the Tax Code in regard to the as-applied challenge.

We hold that we do not have original jurisdiction over Allcat's as-applied challenge.

---

12. Section 112.108 provides as follows:

Except for a restraining order or injunction issued as provided by this subchapter, a court may not issue a restraining order, injunction, declaratory judgment, *writ of mandamus or prohibition,* order requiring the payment of taxes or fees into the registry or custody of the court, or other similar legal or equitable relief against the state or a state agency relating to the applicability, assessment, collection, or constitutionality of a tax or fee covered by this subchapter or the amount of the tax or fee due, provided, however, that after filing an oath of inability to pay the tax, penalties, and interest due, a party may be excused from the requirement of prepayment of tax as a prerequisite to appeal if the court, after notice and hearing, finds that such prepayment would constitute an unreasonable restraint on the party's right of access to the courts. *The court may grant such relief as may be reasonably required by the circumstances.* A grant of declaratory relief against the state or a state agency shall not entitle the winning party to recover attorney fees.

TEX. TAX CODE § 112.108 (emphasis added).

## IV. Attorney's Fees

Allcat seeks to recover attorney's fees pursuant to the DJA. *See* TEX. CIV. PRAC. & REM.CODE §§ 37.001–.011. It argues that we should presume the Legislature intended to incorporate the DJA into section 24 of the Act because section 24 authorizes declaratory relief, thus providing jurisdiction over Allcat's claim for attorney's fees. *See id.* § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). The Comptroller points out that even if section 24 validly grants jurisdiction to this Court, its language plainly authorizes only declaratory and injunctive relief—not attorney's fees. *See* Act § 24 (stating that the Court "may issue injunctive or declaratory relief in connection with the [constitutional] challenge"). We agree with the Comptroller that section 24 does not reflect legislative intent to incorporate the DJA.

When construing a statute we presume that every word in the statute was used for a purpose. *In re M.N.,* 262 S.W.3d 799, 802 (Tex.2008). Just as importantly, we presume that every word excluded from the statute was excluded for a purpose. *Id.*

Assuming, without deciding, that Article V, Section 3(a) authorizes the Legislature to confer jurisdiction for us to award attorney's fees in an original proceeding such as this, section 24 of the Act does not reference the DJA. The presumption Allcat contends for is the opposite of the long-standing judicial presumption that words excluded from a statute were excluded for a purpose. We will not apply it. We conclude that we do not have jurisdiction over the claim for attorney's fees.

The Comptroller advances several reasons why Allcat should not recover attorney's fees if we have jurisdiction over the claim. Because we do not have jurisdiction over the claim, we do not address her contentions. *See Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex.2000) (noting that an appellate court's opinion is advisory if the court does not have jurisdiction over the pending matter).

## V. Response to the Dissent

The dissent says section 24 of the Act does not confer mandamus jurisdiction on the Court because it does not use the word "mandamus." The dissent reads section 24 too narrowly. The Legislature clearly intended section 24 to confer jurisdiction on this Court for all taxpayer suits challenging the constitutionality of the Act. The second part of section 24 references injunctive or declaratory relief, but nowhere does the Act purport to limit the jurisdictional grant to those types of relief. Certainly the first part of section 24 does not limit the jurisdiction it attempts to confer on the Court. And although the conferral of jurisdiction in section 24 is broader than that authorized by Article V, Section 3(a), this does not mean that mandamus jurisdiction is not included within section 24's jurisdictional grant. As we noted in section IIA, when the Legislature attempts to confer jurisdiction in excess of that allowed by the Constitution, we exercise jurisdiction only to the extent allowed by the Constitution. *See Love,* 28 S.W.2d at 522. In this regard, should declaratory or injunctive relief have been appropriate in this case, we would not have looked to the jurisdiction purportedly granted in section 24 for authority. We decided in *Love* and *Lane* that such a grant would not be constitutional. Rather, we would have determined whether such relief was necessary to make our mandamus jurisdiction effective, that is, whether it was correlative to our mandamus jurisdiction. *Lane,* 249 S.W.2d at 593.

The dissent also says that Chapter 112 of the Tax Code explicitly prohibits mandamus relief in this type of suit, and the Act is not an exception to that prohibition. We disagree. While section 112.108 of the Tax Code may generally limit the granting of mandamus relief under certain circumstances, section 24 of the Act is a later-enacted, specific grant of original jurisdiction—including mandamus jurisdiction—over the type of proceeding Allcat brings: a challenge to the constitutionality of the Act. Assuming a conflict exists between section 112.108 and the Act, we agree with the dissent that when statutes are in conflict, the more specific, and later, enactment controls. *See* Tex. Gov't Code § 311.026. In this instance, that is the Act. *Compare* Act of May 24, 1989, 71st Leg., R.S., ch. 232, § 16, 1989 Tex. Gen. Laws 232, *with* Act of May 2, 2006, 79th Leg., 3d C. S., ch. 1, §§ 1–27, 2006 Tex. Gen. Laws 1.

The dissent next argues that mandamus is not appropriate here because there is no ministerial duty for the Comptroller to "independently sit in judgment of the constitutionality of every statute she is charged with enforcing." 356 S.W.3d at 482 (Willett, J., dissenting). But we do not address whether she has such a duty, or whether it would have been within her discretion to refuse to enforce the Act as to Allcat's natural person partners because she believed applying it to them would violate the Bullock Amendment. The Comptroller here enforced the statute and relies on it as authority to refuse Allcat's claim for a refund. We determine only that Allcat has not shown entitlement to a refund on the basis that the Comptroller has no legal authority to retain the taxes she collected from Allcat. That is, Allcat has not shown the Act is unconstitutional.

Finally, the dissent discusses at length the question of whether the Legislature violated the separation of powers doctrine by mandating a time limit for us to decide challenges such as Allcat's. *See* Tex. Const. art. II, § 1. The separation of powers issue is neither subtle nor unimportant. However, the issue (1) is not raised or briefed by the parties, (2) is not alleged to have any harmful effect on the outcome of the proceeding or our decision, and (3) does not affect the validity of our decision. Given the state of the record, any opinion on the issue would be advisory. *See, e.g., Valley Baptist Med. Ctr.*, 33 S.W.3d at 822 ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993) (noting that the distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties, and a judgment based on the opinion does not remedy an actual or imminent harm). Nevertheless, the dissent's extensive discussion on this issue warrants at least some response.

Article II, Section 1 of the Texas Constitution provides as follows:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

Tex. Const. art. II, § 1. We discussed in section IIA how a statute conferring more jurisdiction on this Court than Article V, Section 3(a) authorizes is invalid to the extent it exceeds the Legislature's constitutional power to confer jurisdiction. The

principle involved in that determination applies to the provisions of Article II, Section 1: the Legislature cannot validly exercise a power properly attached to the judiciary except as expressly permitted by the Constitution, or exceed the limits imposed on it by the Constitution.

However, this Court does not function in a vacuum. We recognize that our decision will have ramifications. The Legislature apparently concluded that expediting a judicial decision in matters such as this will be in the best interests of all involved. We see no valid reason that this Court cannot cooperate with priorities expressed by other branches of government so long as we fulfill our constitutional duties and neither impair our judicial prerogatives and functions, nor impair the rights of the parties. We do not see how expediting disposition of this matter violates our constitutional duties or impairs our judicial prerogatives or functions; and the parties have neither alleged nor shown that they have been harmed or prevented from properly presenting their positions by the manner of the proceedings.

## VI. Conclusion

We deny Allcat's requests for relief relating to its facial challenge because the Act does not violate Article VIII, Section 24 of the Constitution. We dismiss the as-applied challenge and attorney's fees claim for lack of jurisdiction.

Justice WILLETT filed an opinion concurring in part and dissenting in part, in which Justice LEHRMANN joined.

Justice WILLETT, joined by Justice LEHRMANN, concurring in part and dissenting in part.

Our system of government endows judges with a genuinely stunning power—

that of judicial review, the power to declare laws unconstitutional. But this power, the "proper and peculiar province of the courts,"[1] is by no means boundless. The Texas Constitution that defines our judicial authority also delimits it. And one constitutional curb on judicial power is that of jurisdiction—our very authority to decide cases in the first place.

Ultimately, it falls to us, the courts, to police our own jurisdiction. It is a responsibility rooted in renunciation, a refusal to exert power over disputes not properly before us. Rare is a government official who disclaims power, but liberties are often secured best by studied inaction rather than hurried action.

\* \* \*

Today's decision may well be the Term's most consequential, not because of the dollar amounts at stake, but because of the constitutional principles at stake—and the restraint the Court fails, regrettably, to exercise. With little fanfare, and rushed by an arguably unconstitutional "deadline," the Court expands the limits of mandamus far beyond the limits of our Constitution. Along the way, the Court redefines one of mandamus's two elements, making it far easier for parties to assert mandamus jurisdiction.

The upshot is that litigants will be able to attack a statute's constitutionality via mandamus, a remedy we once could honestly describe as "extraordinary."[2] Now, any time the Legislature desires a quick answer, it can leapfrog lower-court review altogether and declare virtually any case within this Court's limited original jurisdiction. As explained below, I believe we

---

**1.** THE FEDERALIST No. 78, at 427 (Alexander Hamilton) (E.H. Scott ed., 1898).

**2.** *See, e.g., Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

lack exclusive original mandamus jurisdiction here.

The Court, however, is perhaps not alone in its overreaching. The Legislature, like the judiciary, is bound by the Constitution, which curbs legislative power as surely as it curbs judicial power. Specifically, the Separation of Powers provision limits the Legislature's ability to interfere with the inner workings of the judiciary, and vice versa. The judicial branch is the Legislature's constitutional partner, but not a junior partner.

The Act in this case purports to dictate how and when the Supreme Court must perform its judicial duties, by ordering the Court to hear this case—and more, to decide it within 120 days of filing. The parties have not addressed whether such a deadline can be squared with our Constitution's most cardinal principle: that powers be separated among supposedly co-equal branches of government. Perhaps a future case will present the issue squarely.

I agree with the Court that we lack jurisdiction over Allcat's *as-applied* challenge (based on the limits in the Constitution, not simply those in the Act itself) and its request for attorney fees. As for Allcat's *facial* challenge, we can only reach it by overreaching. From that part of today's opinion, which I believe disregards the Constitution's limits on our jurisdiction, I respectfully dissent.

## I. The Court Lacks Original Mandamus Jurisdiction over Relators' Facial Challenge.

The Court asserts exclusive original mandamus jurisdiction even though:

1. no statute grants us such jurisdiction;

2. the Constitution expressly requires such a statute; and

3. other statutes explicitly forbid mandamus relief in taxpayer suits like this.

More disconcerting, the Court then declares mandamus relief appropriate even though there is no "abuse of discretion" for us to correct nor any "ministerial duty" for us to enforce.

In short, the Court dramatically redefines not just the limits on our mandamus jurisdiction, but one of the essential elements of what once was deemed an "extraordinary" form of relief.[3]

## A. No Statute Gives Us Jurisdiction to Grant Mandamus Relief.

The Court does not, and cannot, identify any explicit pronouncement from the Legislature giving us original jurisdiction to grant mandamus relief in this case.

This sounds technical but is hardly insignificant. The Constitution restricts our original jurisdiction, meaning we cannot assert what we have not been assigned. Our original jurisdiction is limited to just those cases where the Legislature has expressly conferred on us the authority to issue writs of quo warranto or mandamus. The Legislature has not done so here.

## 1. Before We Can Exercise Original Mandamus Jurisdiction, the Legislature Must Give Us Authority to Issue Mandamus Relief.

The last sentence of Article V, Section 3(a) covers our original jurisdiction:

The Legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except as against the Governor of the State.[4]

---

3. *See id.*

4. Tex. Const. art. V, § 3(a).

Our original jurisdiction is not self-effectuating. We can exercise only what the Legislature has conferred, and it can confer only what the Constitution allows it to confer: jurisdiction "to issue writs of quo warranto and mandamus in such cases as may be specified."[5]

## 2. The Act Does Not Confer Such Jurisdiction on This Court.

In this case, section 24(a) of the Act purports to give us exclusive original jurisdiction over any challenge to the Act's constitutionality: "The supreme court has exclusive and original jurisdiction over a challenge to the constitutionality of this Act or any part of this Act and may issue injunctive or declaratory relief in connection with the challenge."[6]

Notably, section 24(a) makes no mention of giving this Court original jurisdiction to issue writs of mandamus. In fact, the word "mandamus" does not appear anywhere in the Act.[7]

My question, then, is this: Given that the only way we can have original jurisdiction over a case is if the Legislature confers on us original jurisdiction to issue writs of mandamus (or quo warranto), and given that the Act makes no mention of giving this Court such jurisdiction, where does our original mandamus jurisdiction over this case come from?

## 3. A Grant of Exclusive Original Jurisdiction Is Not the Same as a Grant of Jurisdiction to Issue a Writ of Mandamus.

The Court contends that we have original mandamus jurisdiction over Allcat's facial challenge because (1) "[t]he Act clearly expresses legislative intent that the Court consider the constitutionality of its provisions," (2) mandamus is "proper or necessary" here, and (3) "[i]f the grant of jurisdiction or the relief authorized in the statute exceeds the limits of Article V, Section 3(a), then we simply exercise as much jurisdiction over the case as the Constitution allows, as we did in *Love*."[8]

Unpacking these statements, it appears the Court uses a three-step process to conclude we have jurisdiction.

*Step 1:* Under our Constitution and *Love v. Wilcox*, the Legislature can confer on us original jurisdiction to issue writs of mandamus or quo warranto (but it cannot give us any *more* original jurisdiction).

*Step 2:* If the Legislature "expresses legislative intent" to grant us original jurisdiction, and if mandamus is deemed "proper or necessary," then we have such original jurisdiction to whatever extent the Constitution allows.

*Step 3:* If the Legislature confers *more* jurisdiction than the Constitution allows, or authorizes us to issue relief that the Constitution doesn't, we simply read the jurisdictional grant narrowly, "exercis[ing] [only] as much jurisdiction ... as the Constitution allows."

The problem is that Steps 2 and 3 do not flow from Step 1. In fact, they are logically incompatible with it. When it comes to this Court's original jurisdiction, the Constitution gives the Legislature an extrathin slice of conferral authority: It can do no more than "confer original jurisdiction

---

**5.** *Id.*

**6.** Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 24(a), 2006 Tex. Gen. Laws 1, 40 [hereinafter "Act"].

**7.** *See generally* the Act.

**8.** *Ante* at 462 (citing *Love v. Wilcox*, 119 Tex. 256, 28 S.W.2d 515, 522 (1930)).

... *to issue writs of quo warranto and mandamus.*" [9] The Act at issue here does not even attempt to do this.[10]

This fact sets this case apart from *Love.* There, the legislative conferral stated that "[t]he Supreme Court shall have the power, or authority, or jurisdiction, to issue the Writ of Mandamus, or any other Mandatory or compulsory Writ or Process." [11] It thus gave the Court, in clear and specific terms, the authority and jurisdiction to issue writs of mandamus in certain situations.[12] The problem in that case was that the Legislature gave us *too much* authority. Its express conferral went beyond the writs we *could* issue pursuant to our original jurisdiction, to those we *could not.* We concluded the Legislature had made a proper, express grant of original jurisdiction—to issue writs of mandamus in original proceedings—along with an improper grant—to issue, for example, original writs of injunction.[13]

Here, by contrast, the Act does not make *any* proper grant of original jurisdiction; it simply announces that this Court "has exclusive and original jurisdiction over any challenge to the Act's constitutionality." [14] The Act, unlike the statute in *Love,* makes no mention of giving us the "power, or authority, or jurisdiction" to issue writs of mandamus in such cases.[15] Yet under the Constitution and our own caselaw, this is the only original jurisdiction the Legislature can confer on us.[16]

Thus, the Court today concocts a proper grant of original jurisdiction out of an Act that makes only an improper one. The Court justifies this move by noting that the Act exhibits clear "legislative intent" that we be the Court of first and last resort for challenges to the Act's constitutionality, and by noting that mandamus is "proper or necessary" here.[17] Never mind that neither "legislative intent," nor our independent determination that mandamus is "proper or necessary," has much to do with the paramount constitutional point: Under Article V, Section 3(a), the Legislature may only confer on us original jurisdiction *to issue writs of mandamus or quo warranto.*[18] If the Legislature fails to do so, I would not, given the Constitution's restrictive language, improvise a conferral

9. Tex. Const. art. V, § 3(a) (emphasis added); *see also Love,* 28 S.W.2d at 522 ("[T]he Constitution limits the original jurisdiction of the court to the issuance of writs of quo warranto and mandamus.").

10. *See* Act § 24(a).

11. 28 S.W.2d at 521–22.

12. *Id.*

13. *See id.* at 522.

14. Act § 24(a).

15. *See Love,* 28 S.W.2d at 522.

16. *See* Tex. Const. art. V, § 3(a); *Love,* 28 S.W.2d at 522. I do not disagree with the Court's point that, where our mandamus jurisdiction attaches, the Court has the correlative authority to grant injunctive or declaratory relief. *See ante* at 461 (citing *Lane v. Ross,* 151 Tex. 268, 249 S.W.2d 591, 593 (1952)). But the key point the Court skates over is that we have this correlative authority only in those cases *where our mandamus jurisdiction has attached. See Lane,* 249 S.W.2d at 593. Attachment occurs only where the Legislature expressly gives us the authority to issue writs of mandamus (or quo warranto). My analysis of this sub-issue might be different if section 24(a) said something like the following: "The supreme court has the power, or authority, or jurisdiction, to issue writs of mandamus in conjunction with challenges to the constitutionality of this Act." But the Act says nothing of the sort. And section 24(a)'s express grant of authority to issue injunctions or declaratory judgments does not change this fundamental fact.

17. *Ante* at 462.

18. *See* Tex. Const. art V, § 3(a).

of original jurisdiction that is simply not there.

The consequence of today's rather striking departure from our precedent is that only two limiting factors remain on our original jurisdiction: (1) the Court's ability to discern "legislative intent" to confer such jurisdiction, and (2) the Court's ability to reimagine the underlying dispute as a mandamus case.[19] And these, of course, are only as limited as the Court's willingness to remake mandamus into something more ordinary than extraordinary.

In sum, the Court today discovers original mandamus authority in a conferral statute that says nothing about mandamus authority. The Court identifies no other source of jurisdiction. Bereft of a proper grant of original jurisdiction, the Court errs by exercising jurisdiction over Allcat's facial challenge.

**B. Chapter 112 of the Tax Code Sets the Rules for Taxpayer Suits and Explicitly Bars Mandamus Relief; the Act Makes No Exception.**

The Court takes upon itself the daunting task of finding original mandamus jurisdiction here where no statute has expressly conferred it. Making matters more complicated is the fact that this suit is a challenge to a *tax law*. And the Legislature has already created a number of statutory rules, restrictions, and requirements that apply in such taxpayer suits. Chapter 112 of the Tax Code sets forth those restrictions.[20] They limit where and when a taxpayer can bring her suit, what prerequisites she must meet before filing, and what

relief she is (and is not) entitled to. And while the Act here creates certain exceptions to those rules, the Act does not create an exception to Chapter 112's prohibition on mandamus relief in taxpayer suits.[21]

**1. Chapter 112 Prohibits Mandamus Relief in Suits Like This.**

The language of the relevant provision—section 112.108 of the Tax Code—is so specific that it merits reproducing in its entirety:

Except for a restraining order or injunction issued as provided by this subchapter, *a court may not issue* a restraining order, injunction, declaratory judgment, *writ of mandamus* or prohibition, order requiring the payment of taxes or fees into the registry or custody of the court, *or other similar legal or equitable relief against the state or a state agency relating to the* applicability, assessment, collection, or *constitutionality of a tax or fee covered by this subchapter* or the amount of the tax or fee due, provided, however, that after filing an oath of inability to pay the tax, penalties, and interest due, a party may be excused from the requirement of prepayment of tax as a prerequisite to appeal if the court, after notice and hearing, finds that such prepayment would constitute an unreasonable restraint on the party's right of access to the courts. The court may grant such relief as may be reasonably required by the circumstances. A grant of declaratory relief against the state or a state agency shall not entitle

---

**19.** I discuss this second factor further *infra* Section I.C.

**20.** *See generally* Tex. Tax Code ch. 112.

**21.** Importantly, no one disputes this is a Chapter 112 taxpayer suit and that Chapter 112's restrictions thus apply. The Court, in

discussing jurisdiction over Allcat's facial challenge, states explicitly and unequivocally that "Allcat's claim is subject to chapter 112 of the Tax Code." *Ante* § III. The parties appear to agree. In its brief, Allcat cites to sections 112.051–.053 to show it complied with the Code's pre-filing requirements.

the winning party to recover attorney fees.[22]

Thus, section 112.108 explicitly prohibits any court from granting injunctive or declaratory relief or issuing any writ of mandamus or any other legal or equitable relief not already allowed elsewhere in Chapter 112.[23]

## 2. Section 24(a) of the Act, While Purporting to Allow Certain Relief Notwithstanding Chapter 112, Does Not Mention Mandamus.

Section 24(a) purports to create an exception to this "no relief" rule. In particular, it announces that this Court can issue declaratory or injunctive relief in connection with a constitutional challenge made in a specific breed of taxpayer suit—specifically, challenges to the Act.[24] But section 24(a) does *not* create an exception to the

Tax Code's prohibition on courts, including this Court, issuing writs of mandamus.[25]

This Court generally has the authority to issue mandamus relief against government officials,[26] but Chapter 112 of the Tax Code creates an exception to that power, taking it away in the limited context of taxpayer suits. The Act—specifically, section 24(a)—does not give it back. Indeed, as discussed above, the Act doesn't mention mandamus anywhere.[27] As the Act does not establish an "exception to the exception," we lack mandamus authority here.[28]

## 3. The Moral of the Story: The Tax Code Prohibits Us from Exercising Mandamus Jurisdiction over This Case.

The plain language of Chapter 112 prohibits courts from granting mandamus re-

22. Tex. Tax Code § 112.108 (emphasis added).

23. In addition to this restriction, Chapter 112 creates others, such as mandating that a taxpayer bring her taxpayer suit in the district court of Travis County. Tex Tax Code § 112.001. This is, in turn, a legislatively created exception to the default jurisdiction rule in our Constitution: Under Article V, Section 8, the district courts have exclusive original jurisdiction over all matters unless the Legislature specifies otherwise. *See* Tex. Const. art. V, § 8. Section 24(a) of the Act, in terms of its jurisdiction grant, purports to create an "exception to the exception" requiring taxpayers to bring their constitutional challenges to the Act in this Court.

24. *See* Act § 24(a).

25. Importantly, because the Act does not give us original mandamus jurisdiction in suits challenging the Act, it cannot give us authority to grant declaratory or injunctive relief in such suits either. As discussed *supra* Section I.A., we held in *Love* that the Legislature cannot give us jurisdiction to issue such relief in original proceedings, absent a contemporaneous issuance of a writ of mandamus. *Love*, 28 S.W.2d at 522. We refined this point in *Lane*, noting that we can issue injunctions or

declaratory judgments, in original proceedings, to make our mandamus writs effective-but *Lane* did not change the fact that the Legislature cannot give us authority, in original proceedings, to issue stand-alone injunctions or declaratory judgments. *Lane*, 249 S.W.2d at 593. Because the Legislature lacks that power, its attempt to do so here is invalid.

26. *See* Tex. Gov't Code § 22.002(a).

27. *See supra* § I.A.

28. As the Court notes in concluding that we *lack* jurisdiction over Allcat's as-applied challenge, the Government Code's conferral of mandamus jurisdiction does not override Chapter 112's prohibition on mandamus, either. *See ante* § III. We have held that Government Code section 22.002(c) grants us original jurisdiction over mandamus proceedings against executive government officers, and gives us exclusive authority to issue the writ against them. *See A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 673–74 (Tex. 1995). However, this conflicts with Chapter 112's more specific, later-enacted prohibition on courts issuing mandamus relief in taxpayer suits.

lief in taxpayer suits like this. The Act here does not make an exception to this rule, even while it envisions the availability of injunctive and declaratory relief.

The Court seems fully aware of this. In fact, section 112.108's bar on mandamus relief provides part of the foundation for the Court's conclusion that we lack jurisdiction over Allcat's as applied challenge.[29]

To my mind, what's good for the goose is good for the gander. Or, in this case, the opposite: If it's no good for the gander, it's no good for the goose either. Just as the Tax Code's bar on mandamus relief forbids us from exercising original mandamus jurisdiction over Allcat's *as-applied* challenge, it also bars us from exercising such jurisdiction over Allcat's *facial* challenge.

### C. Mandamus is Inappropriate in a Case Like This, Because There Is No Ministerial Duty to Compel the Executive to Perform.

I come now to what I see as the most tenuous part of the Court's holding. For the Court to conclude that we can exercise exclusive original mandamus jurisdiction here, it must first shoehorn this case into the "mandamus" category. But under our mandamus jurisprudence, it is impossible to do so.

This is not a mandamus proceeding because one of the two elements required for mandamus relief is entirely absent. Mandamus is appropriate only to correct an abuse of discretion or to compel a government officer to perform a ministerial duty.[30] Neither is present here. The Comptroller—the officer Allcat seeks to mandamus—has neither abused her discretion nor failed to perform a ministerial duty.

My view is uncomplicated: Deciding whether a statute is constitutional is not the proper subject of a mandamus proceeding. And that's all this case is—a garden-variety constitutional challenge. There is no ministerial duty to compel, no abuse of discretion to correct. There is only Allcat's argument that the Act is unconstitutional. This is simply not a mandamus case.

#### 1. The Elements of Mandamus

To obtain mandamus relief, a relator must demonstrate two things: (1) a lower court or government official committed a clear abuse of discretion or has failed to perform a ministerial duty;[31] and (2) he has no adequate remedy at law and therefore needs the writ.[32] My primary quibble is with the first element.

The purpose of mandamus—and the role it is invoked to play here—is to compel a government agent to perform a *ministerial* act or duty.[33] But this is, for lack of a better term, a truly extraordinary remedy: By issuing the writ, the Court essentially controls the conduct of a government officer by telling her what she must do.[34] Therefore, the writ will issue only when the duty to be performed is "clear and definite and involves the exercise of no discretion—that is, when the act is minis-

---

29. *See ante* § III.

30. *Walker,* 827 S.W.2d at 839.

31. *Id.* at 839–40.

32. *Id.*

33. *Id.* at 839. As the *Walker* Court noted, since the 1950's the Court has increasingly used the writ to correct "clear abuse[s] of discretion" by trial courts. *Id.* (citing cases).

34. *See Turner v. Pruitt,* 161 Tex. 532, 342 S.W.2d 422, 423 (1961).

terial."[35] The meaning of "ministerial act" is terribly important because it helps set the boundaries of the judiciary's power to issue writs of mandamus. Thus, we have long defined that term narrowly:

> The distinction between ministerial and judicial and other official acts seems to be that where the law prescribes and *defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment*, the act is ministerial; but where the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed merely ministerial.[36]

### 2. The Alleged "Duty" that the Court Identifies

The Court suggests that Allcat seeks a writ of mandamus compelling the Comptroller to refund taxes Allcat paid under the Act; this alleged duty, if it exists, flows from the fact that the Act is unconstitutional.[37] The Court denies the writ: Because Allcat failed to show the Act is unconstitutional, "Allcat has not shown entitlement to a refund."[38] That is, Allcat has failed to prove the existence of any ministerial duty for us to compel the Comptroller to perform.

The only problem with the Court's reasoning is that it is circular. To qualify as a "mandamus" case, there must *already* exist, *at the time of filing*, a ministerial duty that the petitioner wants enforced. But the Comptroller does not have a duty to pay a refund on an unconstitutional tax until that tax is first declared unconstitutional. Unless and until this happens, there neither is nor can be any duty to issue a refund, precisely because there is no "unconstitutional" tax. There is, simply, a tax, which is presumptively constitutional until proven otherwise.[39]

The duty the Court identifies—and uses to satisfy the first element of mandamus—is a *conditional* duty: the duty to refund taxes paid on an unconstitutional law *if that law turns out to be unconstitutional.* But a *conditional* duty is not a *ministerial* duty correctable by mandamus. That is, the conditional duty to issue a refund for a potentially unconstitutional tax cannot provide the basis for jurisdiction over a mandamus proceeding challenging the constitutionality of that same tax.

The Court turns for support to our decision in *LeCroy v. Hanlon.*[40] But *LeCroy* was not even an original proceeding—the trial court there had granted a writ of mandamus, but we did not. Nor were we ever asked to *review* the trial court's decision to issue the writ, because the petitioner (the State, against whom the writ had been issued) only sought review of the

---

**35.** *Id.*

**36.** *State Bar of Tex. v. Heard,* 603 S.W.2d 829, 832 (Tex.1980) (emphasis added) (quoting *Comm'r of the Gen. Land Office v. Smith,* 5 Tex. 471, 479 (1849)).

**37.** *See ante* at 462 (asserting that "Allcat seeks an order directing the Comptroller to refund part of the taxes it paid" and therefore concluding that mandamus is "proper or necessary" here); *id.* at 462 ("In this matter, if Allcat is correct and the Act is unconstitutional, then the Act does not provide legal authority for the Comptroller to retain the taxes and

Allcat will be entitled to mandamus directing a refund.").

**38.** *Id.* at 473.

**39.** *See, e.g., Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003) (noting that when this Court reviews the constitutionality of a statute, we "presum[e] the statute is constitutional," and "the party challenging the constitutionality of a statute bears the burden of demonstrating that the enactment fails to meet constitutional requirements").

**40.** 713 S.W.2d 335 (Tex.1986).

injunctive and declaratory relief that the trial court had granted.[41] More importantly, we did *not* hold in *LeCroy* that mandamus is an appropriate vehicle for attacking the constitutionality of a statute. In that case, we focused solely on the merits of the parties' constitutional arguments. In fact, the word "mandamus" appears just twice in the entire opinion; both instances occur during our discussion of the case's procedural history.[42]

The only other case the Court cites is *Cramer v. Sheppard.*[43] But like *LeCroy*, *Cramer* provides no support for the proposition that the constitutionality of a statute is an appropriate subject for a mandamus proceeding. The Court is correct that in *Cramer* we mandamused the Comptroller to make a payment he had refused to make.[44] But mandamus did *not* issue to stop the Comptroller from enforcing what turned out to be an unconstitutional statute. In fact, no party even made a constitutional argument in *Cramer*—much less attacked the constitutionality of a statute.[45]

The "duty" the Court identifies, then, is not a mandamus-able one. Yet for this case to fall into the "mandamus" category—which it must, before we can exercise exclusive original mandamus jurisdiction—there must have existed a ministerial duty, owed by the Comptroller to Allcat, at the time Allcat filed its case.

### 3. The Alleged "Duty" that Allcat Identifies

Allcat *does* allege such a duty. In its own words, Allcat seeks a writ of manda-mus compelling the Comptroller and the Attorney General to do their constitutional duty "to preserve, protect, and defend the Constitution"[46]—*by refusing to enforce this (allegedly) unconstitutional tax.*

The problem for Allcat is that this alleged "duty" fails our "precision and certainty" test for ministerial duties—nowhere is it defined "with such precision and certainty as to leave nothing to the exercise of discretion or judgment."[47] There is no statute or case to cite, no clear statement of a duty that an executive must independently sit in judgment of the constitutionality of every statute she is charged with enforcing, *and refuse* to enforce statutes she unilaterally concludes are unconstitutional.

### 4. The Comptroller's Actual Duty

I do not mean to suggest that this case is totally devoid of ministerial duties. As a matter of fact, the Comptroller *does* have a duty here, a solemn one: to enforce the laws that the Legislature has charged her with enforcing. Indeed, our Constitution is designed such that core legislative power—the power to enact laws—is vested in the Legislature, while the executive is charged with enforcing those laws.[48] The power of *suspending* laws—of refusing to enforce them—is vested solely in the Legislature.[49] As the Comptroller argued, if the Separation of Powers provision means anything, it is that the Executive must enforce the laws that the Legislature

41. *Id.* at 337.

42. *See id.* at 336–37.

43. 140 Tex. 271, 167 S.W.2d 147 (1942).

44. *See id.* at 156.

45. *See generally id.*

46. TEX. CONST. art. XVI, § 1.

47. *Heard,* 603 S.W.2d at 832.

48. *See* TEX. CONST. art. II, § 1.

49. *See id.* art. I, § 28 ("No power of suspending laws in this State shall be exercised except by the Legislature.").

passes, unless and until the judiciary says otherwise.

### 5. The Rare Exception: *Corsicana Cotton Mills*

There is a narrow exception to this general rule. If the Executive is called upon to enforce an unconstitutional law, she can refuse to enforce it, and she can use her determination that the law is unconstitutional as a *defense* in a mandamus proceeding to *compel* her to enforce the law.[50] This was our holding in *Corsicana Cotton Mills, Inc. v. Sheppard.*[51]

There, the Legislature had passed a law requiring the Comptroller to reimburse a Texas corporation for erroneously paid franchise taxes. Apparently, the corporation had been overpaying its taxes for years. (It was undisputed that this overpayment was the corporation's fault and that no State agent had ever done anything to induce it.[52]) When the corporation realized its error, it lobbied the Legislature for a state warrant for repayment.[53] The Legislature complied.[54]

The dispute arose when the Comptroller refused to enforce the statute. That is to say, he refused to repay the corporation. Thus, the corporation sought a writ of mandamus in an original proceeding in this Court to compel the Comptroller to obey the statute and make the legislatively required payment.[55]

The Comptroller argued the statute was unconstitutional.[56] We agreed and refused to issue the writ. We concluded that "[w]hen a legislative act requires an officer to perform a ministerial duty, he should perform it if the act is not unconstitutional."[57] At the same time, we noted that,

When the law requires an officer to act, although the act be ministerial merely, if he is directly responsible for his official acts he may refuse to act, *if in his judgment* the law is in conflict with some constitutional provision, and, in case proceedings are instituted to coerce him, he may set up the supposed defect in the law as a defense.[58]

### 6. Allcat's Approach Turns *Corsicana Cotton Mills* on Its Head.

There is a major difference between the approach that Allcat advocates, and the one we adopted in *Corsicana Cotton Mills*. To use the Comptroller's parlance, this is the difference between using the law as a *sword*, and using it as a *shield*. Under the latter approach, the Executive can defend herself in a mandamus action, whereby a party seeks to compel her to *enforce* a statute, by arguing that in her judgment the law is unconstitutional. This is the approach we endorsed in *Corsicana Cotton Mills*.

Under Allcat's approach, a relator can use *its own* determination that a law is unconstitutional as a sword to compel the Executive *not* to enforce a law that *the relator itself* has determined to be unconstitutional.

The fundamental difference here between the two approaches is that Allcat is

50. *See Corsicana Cotton Mills, Inc. v. Sheppard,* 123 Tex. 352, 71 S.W.2d 247, 251 (1934).

51. *Id.*

52. *Id.* at 248.

53. *Id.*

54. *Id.*

55. *Id.*

56. *Id.* at 249.

57. *Id.* at 251.

58. *Id.* (emphasis added).

not seeking to mandamus the Comptroller to perform a *ministerial duty.* Yet this is the one and only species of duty that we can mandamus the Executive to perform.[59] The "duty" that Allcat seeks to enforce involves the Comptroller's independent, reasoned "judgment [that] the law is in conflict with some constitutional provision."[60] Absent a clear and immediately relevant pronouncement by a court on a statute's constitutionality, the only possible way the Executive can conclude that a statute is unconstitutional, and that she should therefore not enforce it, is by exercising *judgment.* By definition, this is not a ministerial duty or action.

Nor can I see how it can possibly be an abuse of discretion for the Comptroller to enforce a statute that no court has held unconstitutional.

Allcat does not cite any precedent from this jurisdiction to the contrary. Probably, it cannot. This may explain why the Court characterizes the alleged "duty" here in the way it does, rather than adopting Allcat's approach and simply announcing that the Executive has a mandamusable, nondiscretionary duty to independently judge the constitutionality of statutes, and to refrain from enforcing any she suspects are invalid.

But there are two hiccups with the Court's approach. First, this duty is not the one that Allcat identifies and seeks to enforce. Second, as discussed above, it is logically impossible for such a duty to exist until *after* a court has first struck down the underlying law as unconstitutional. Thus, to have any hope of transforming this non-mandamus case into a mandamus case, the Court seems logically required to adopt Allcat's position because, in order

for us to exercise mandamus jurisdiction here, there must be an abuse of discretion or a ministerial duty to be compelled at the time Allcat filed suit.[61] Under Allcat's approach, at least, the Court's jurisdiction is not dependent on how it decides the merits of the case. The only problem with that approach is that the "duty" it turns on is nonexistent under Texas law.

### 7. Conclusion: The Court Errs in Exercising Mandamus Jurisdiction.

Allcat seeks a writ of mandamus to compel the Comptroller to perform a ministerial duty she does not have. The Court, perhaps in an attempt to navigate around this problem, recharacterizes the mandamus that Allcat seeks. But the duty the Court identifies logically cannot exist until *after* we first decide the merits of Allcat's suit. The bottom line is, neither "duty" satisfies the first element of mandamus.

It's hardly a mystery why no support exists for either position. Mandamus is (or is supposed to be) an extraordinary remedy, used only to correct a clear abuse of discretion or to compel government officers to perform a duty that is wholly nondiscretionary. Mandamus is not a jurisdictional talisman that parties can wave to produce instant Supreme Court review.

The consequence of today's holding is to completely overhaul this element of mandamus, thus making mandamus relief far more available and inviting increasing resort to mandamus proceedings in this Court. Not long ago, one of my colleagues lamented that the Court was dragging Texas into "a whole new world" of manda-

---

59. *See Walker,* 827 S.W.2d at 839.

60. *See Corsicana Cotton Mills,* 71 S.W.2d at 251.

61. *See Walker,* 827 S.W.2d at 839.

mus practice.[62] He criticized the Court for stretching the writ's second element ("no adequate remedy at law") beyond what he believed our caselaw allowed.[63] Today, the Court turns its sights to mandamus's first element, and in my view dismantles an important limit on the judiciary's writ power. I fear that the lure of instant Supreme Court review of select legislation will prove increasingly irresistible.

In conjunction with the Court's expansive holding that we have original mandamus jurisdiction even absent express conferral, today's mandamus makeover virtually guarantees that parties who crave a quick final answer to their constitutional questions can now make a beeline for this Court, bypassing the normal judicial process, so long as there's even a whiff of "intent" that the Legislature wanted it to be so.[64]

The Court identifies only one potential source of jurisdiction—a legislative declaration that we have exclusive original jurisdiction over cases like this. But this legislative conferral is invalid because it gives us original jurisdiction the Constitu-tion does not allow, and it fails to give us the only type of original jurisdiction the Constitution does allow. Accordingly, I respectfully dissent from the Court's conclusion that we have jurisdiction over All-cat's facial challenge.

## II. Constitutional Postscript—The Act's 120–Day "Deadline" for This Court's Decision Raises Separation of Powers Concerns.

Section 24(b) of the Act declares that this Court "shall rule on a challenge filed under this section on or before the 120th day after the date the challenge is filed." [65] The Court does not discuss the deadline, as no party raised it (unsurprising, as the Court *itself* is the "party" most directly affected). That said, such a deadline at minimum raises a constitutional eyebrow.

The Texas Constitution, in a single sentence, declares an emphatic and elemental principle: The powers of government are divided among three distinct branches, and no branch may exercise the powers of another *unless the Constitution expressly allows it.*[66] In fact, our explicit Separation

---

62. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 474–75 (Tex.2008) (Wainwright, J., dissenting).

63. *Id.*

64. *See ante* at 462 ("The Act clearly expresses legislative intent that the Court consider the constitutionality of its provisions.").

65. Act § 24(b).

66. Article II, Section 1 states:
The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.
TEX. CONST. art. II, § 1.
This concept has a rich history in Texas, predating even the Republic itself. In fact, there has been a Separation of Powers provision in every one of Texas's Constitutions. The wording in the current Constitution is identical to the wording used in our four previous state constitutions. TEX. CONST. art. II, § 1, interp. commentary (Vernon 2007); *see* Harold H. Bruff, *Separation of Powers Under the Texas Constitution,* 68 TEX. L.REV. 1337, 1340 (1990) [hereinafter "Bruff, *Separation of Powers* "]. The Republic of Texas had a shorter version in its Constitution, but the idea was exactly the same. *See* THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 89 (George D. Braden ed., 1977) [hereinafter "Braden, CONSTITUTION OF TEXAS"]. Texas even had a Separation of Powers provision *before* it was Texas: Such

of Powers provision—something the U.S. Constitution lacks [67]—prohibits not just the *exercise* of one branch's powers by another branch, but also any *interference* with another branch's exercise of its own authority.[68]

Section 24(b) arguably does precisely that. By setting a hard-and-fast deadline for deciding a case, it threatens to interfere with our sworn adjudicatory duties under our Constitution. Imagine if the constitutional tables were turned and this Court purported to dictate the time and manner of legislative decision-making, if we tried to seize control of the legislative calendar and prescribe in minute detail how, when, in what numbers, in what committees, for what purposes, or for how long elected lawmakers could meet (or, for that matter, what laws they could and could not consider). The outcry would be deafening—and rightly so.

Preservation of the judiciary as a co-equal branch is vital because Texans look to the courts—not least to this Court—to safeguard their liberties and legal rights, check abuses of authority by other branches, and preserve our constitutional framework. In other words, a judiciary cannot secure others' freedom without first securing its own. Since our Constitution vests the judicial power in the judiciary alone

---

provisions appeared in both the Mexican national constitution of 1824 and the Coahuila y Tejas state constitution of 1827. *Id.;* Bruff, *Separation of Powers*, at 1341 n. 24.

**67.** The Texas Constitution differs—and has always differed—from its federal counterpart in that it explicitly separates the branches of government (whereas the federal Constitution includes no such provision). *See* Braden, CONSTITUTION OF TEXAS, at 89; *see generally* U.S. CONST The fact that Texas has an express separation of powers provision "reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government." *See Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex.Crim.App.1990). So said our constitutional twin, the Texas Court of Criminal Appeals, in striking down an unconstitutional infringement by the Legislature of the judiciary's powers.

The Framers of the U.S. Constitution saw the separation of powers principle as fundamental to their new republic—even if they did not explicitly enshrine the concept in that document. *See, e.g.,* THE FEDERALIST NO. 47, at 266 (James Madison) (E.H. Scott ed., 1898) (arguing that "[n]o political truth is certainly of greater intrinsic value" than the separation of powers doctrine). Madison reasoned that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many ... may justly be pronounced the very definition of tyran-

ny." *Id.* Madison, in turn, thought Montesquieu had written one of the most compelling discussions of the doctrine, and quoted him extensively when urging ratification of the U.S. Constitution:

When the legislative and executive powers are united in the same person or body ... there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner ... Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would be the *legislator.* Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*

*Id.* at 268–69 (quoting Montesquieu, THE SPIRIT OF THE LAWS, Book XI, ch.6).

Madison, like Montesquieu, and like Blackstone as well, saw the separation of powers "to be one of the chief and most admirable characteristics of the English Constitution." *Langever v. Miller*, 124 Tex. 80, 76 S.W.2d 1025, 1035 (1934). And John Adams reasoned that balancing one state power against the other two was the way to keep human nature in check and preserve any degree of freedom. TEX. CONST. art. II, § 1, inter. commentary (Vernon 2007).

**68.** *State Bd. of Ins. v. Betts*, 158 Tex. 83, 308 S.W.2d 846, 851–52 (1958); *see Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.2d 591, 600 (Tex.2001).

and mandates that we exercise the judicial power of the State,[69] this Court—and every Texas court—must jealously (and zealously) insist on judicial independence and a genuinely co-equal system of government.

Section 24(b) is obviously well meaning, demanding a swift answer so lawmakers and taxpayers alike can act with certainty and alacrity. I understand the impulse; more, I commend it:

> To be sure, Members of the Texas Legislature have sworn to 'preserve, protect, and defend the Constitution and laws of the United States and of this State,' and they doubtless believe their enactments honor basic constitutional guarantees. I never second-guess the Legislature's motives and goodwill (and have never needed to); we are blessed with 181 lawmakers who serve Texas with full hearts.[70]

But courts must stand guard against drip-by-drip incursions against judicial independence, however ostensibly benign and laudable.

## A. Application, and Limits, of the Separation of Powers Doctrine—in Texas and Beyond

Thankfully, we have seldom had occasion to review a statute that tells us what to do and when to do it. The few times we have considered the meaning of the Separation of Powers provision as it relates to the legislative and judicial branches, it has generally been in the context of laws that delegated allegedly judicial functions to other branches.[71]

Our general rule is that a constitutional flag is raised when the legislative (or executive) branch interferes with "the functioning of the judicial process in a field constitutionally committed to the control of the courts." [72] Thus, "the controlling factor" for determining whether another branch has encroached vis-à-vis the judiciary is "the presence or absence of interference with effective judicial control" of tasks that are inherently judicial.[73]

## 1. At the Limits: Judicial Rulemaking by the Legislature, and by the Judiciary

Occasionally, our Constitution, notwithstanding its three-way split of government power, lets one branch exercise a power that arguably belongs to another.[74] For

---

69. *See* TEX. CONST. art. V, § 1 (vesting the "judicial power" of Texas in this Court and other courts); *id.* § 3(a) (delineating the powers of this Court).

70. *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 165 (Tex.2010) (Willett, J., concurring) (citations omitted).

71. *See Betts*, 308 S.W.2d at 851–52; *Little–Tex Insulation Co.*, 39 S.W.3d at 599.

72. It appears that we first announced this rule in *State Board of Insurance v. Betts*. At issue there was a statute that gave the executive a role in the liquidation of insurance companies. 308 S.W.2d at 849. Specifically, the statute allowed the State Board of Insurance to appoint a receiver for bankrupt insurance companies and to administer their liquidation—with judicial supervision. *Id.* The Court noted that the process of liquidation is not an inherently judicial function; at the same time, it noted that the courts have an important role to play in such proceedings. Because the law refrained from interfering with the court's exercise of a judicial function—but still gave them a role to play in something of judicial importance—this Court upheld the law. *See id.* at 851–52. The Court reached a similar conclusion in *General Services Commission v. Little–Tex Insulation Co. See* 39 S.W.3d at 594–98, 600.

73. *Betts*, 308 S.W.2d at 851.

74. TEX. CONST. art. II, § 1, interp. commentary (Vernon 2007). In fact, the Framers of our Constitution built an explicit "escape clause" into the Separation of Powers provision. TEX. CONST. art. II, § 1 (stating that no branch may exercise any power of the other branches "ex-

example, while the Constitution lets the judiciary promulgate rules for the court system,[75] it allows the Legislature to override those rules.[76] It even allows the Legislature to cut judicial rules out of whole cloth.[77]

But this power is not limitless. On several occasions, the Court of Criminal Appeals has struck down legislatively imposed judicial rules for violating the Separation of Powers provision.[78] Just as we have held that interfering with the "functioning of the judicial process" violates the separation of powers,[79] our sister High Court has balked when the Legislature "*unduly* interferes with another branch so that the other branch cannot *effectively* exercise its constitutionally assigned powers."[80]

In *Armadillo Bail Bonds v. State*, for example, the Court of Criminal Appeals considered a law that restricted district courts' ability to enter a final judgment when a criminal defendant forfeited his bail bond.[81] Specifically, the law barred the court from entering final judgment *for at least eighteen months* after forfeiture.[82] To guide its analysis, the Court posed two questions: First, is the law grounded in the Legislature's own constitutionally assigned powers?[83] Second, even if so, does

the law unduly interfere, or even *threaten* to unduly interfere, with the judiciary's effective exercise of *its* constitutionally assigned powers?[84]

The Court of Criminal Appeals struck down that temporal restriction as an unconstitutional encroachment on one of the judiciary's core functions: rendering judgments.[85] The Court went so far as to note that upholding the Legislature's rule would necessarily pull the judiciary down a slippery slope: If the Legislature truly had the power to prevent the court from entering judgment for eighteen months, then it could keep the Court from *ever* entering a final judgment.[86]

The Court's point seems to be this: The Constitution may give the Legislature authority over what rules the courts use, but rendering judgment and deciding questions of law are core judicial functions beyond the Legislature's grasp.[87] The separation of powers bars the Legislature from "infring[ing] upon the substantive rights of the Judicial department under the guise of establishing 'rules of court,'" precisely because that would "render[ ] the separation of powers doctrine meaningless."[88] Thus, the Separation of Powers clause bars the Legislature from hindering our ability to render judgment or decide

75. *See* TEX. CONST. art. V, § 31(a), (b).

76. *Id.* §§ 31(a)–(c).

77. *Id.*

78. *See Armadillo Bail Bonds*, 802 S.W.2d at 241; *see also Meshell v. State*, 739 S.W.2d 246, 252–57 (Tex.Crim.App.1987) (holding that the "Speedy Trial Act" violated the Separation of Powers provision by infringing on judicial powers established by TEX. CONST. art. V, § 21).

79. *Betts*, 308 S.W.2d at 851.

80. *Armadillo Bail Bonds*, 802 S.W.2d at 239 (emphasis in original).

81. *See id.* at 238–39.

82. *Id.*

83. *Id.* at 241.

84. *Id.*

85. *Id.*

86. *Id.*

87. *See id.* at 240.

88. *Id.*

questions of law—even though the Legislature has the constitutional authority to create rules that would otherwise do just that.[89]

## 2. Other Jurisdictions Overwhelmingly Agree.

So far as I can tell, other states' courts are virtually unanimous on this point. With one lonely exception,[90] every single high court has concluded it is an inherently judicial task to determine when to render a judicial decision, and the separation of powers bars legislatures from telling courts when to do so.[91]

A factually similar case from the Supreme Court of Montana is particularly instructive. There, a statute essentially required district court judges and supreme court justices to write and issue any opinion within 120 days of when the case was filed.[92] After discussing many decisions

from other jurisdictions striking down such laws, the Montana high court did the same. The court concluded that the law unconstitutionally interfered with the judiciary's internal operations;[93] therefore, it violated Montana's separation of powers provision—a provision that closely resembles our own.[94] The judiciary, and the judiciary alone, should decide when a judicial decision should issue.[95]

The court drove home its message with this intriguing analogy: It likened the *legislature's* deadline-setting for the judiciary, to the *judiciary* telling the legislature how to run its internal operations. The legislature's telling the courts when to render decisions was exactly the same "as if the judiciary would impose limitations on the legislature ... such as the number of committees, the time within which a committee must act, the time each legislator must attend sessions, limiting the time of discussion, limiting the time one bill must

**89.** The Court of Criminal Appeals has since *upheld* legislatively enacted rules that affect the schedules of the district courts. *See State v. Williams*, 938 S.W.2d 456 (Tex.Crim.App. 1997). *Williams* does not invalidate or even restrict the reasoning from *Armadillo Bail Bonds*, however. In *Williams*, the law at issue required district courts to dismiss with prejudice charges against an extradited defendant if the state did not commence trial within 120 days of the defendant's arrival in Texas. 938 S.W.2d at 457–58. Notably, the law included an out: The court could grant "any reasonable or necessary continuance" if it wanted. *Id.* at 458 n. 3. The Court of Criminal Appeals concluded that the law did not unconstitutionally infringe on the judiciary's freedom to exercise core judicial powers. *Id.* at 459. In doing so, the Court reasoned that district courts do not have constitutionally protected authority over whether a case is dismissed. *Id.* Even if correct, this does not affect the holding or reasoning from *Armadillo Bail Bonds*—rendering judgment and deciding questions of law are core judicial functions, and the Legislature cannot interfere with the judiciary's exercise of these. *See* 938 S.W.2d at 458–59.

**90.** *See State ex rel. Emerald People's Util. Dist. v. Joseph*, 292 Or. 357, 640 P.2d 1011 (1982).

**91.** *See, e.g., In re Grady*, 118 Wis.2d 762, 348 N.W.2d 559 (1984); *Coate v. Omholt*, 203 Mont. 488, 662 P.2d 591 (1983); *Sands v. Albert Pike Motor Hotel*, 245 Ark. 755, 434 S.W.2d 288 (1968); *Waite v. Burgess*, 69 Nev. 230, 245 P.2d 994 (1952); *State ex rel. Kostas v. Johnson*, 224 Ind. 540, 69 N.E.2d 592 (1946); *Holliman v. State*, 175 Ga. 232, 165 S.E. 11 (1932); *Atchison, T. & S.F. Ry. Co. v. Long*, 122 Okla. 86, 251 P. 486 (1926); *Schario v. State*, 105 Ohio St. 535, 138 N.E. 63 (1922).

**92.** *Coate*, 662 P.2d at 593. A judge who *failed* to issue his opinion before the 120–day deadline was in automatic violation of the law and could face sanctions (including a pay dock). *Id.*

**93.** *Id.* at 596–97.

**94.** *See* MONT. CONST. art. III, § 1; *Coate*, 662 P.2d at 594.

**95.** *Coate*, 662 P.2d at 596.

pass from one house to the other," and so forth.[96] The judiciary could no more tell the Legislature how to do such things than the Legislature could tell the courts the time and manner in which they must perform their core functions of rendering judgments and deciding questions of law. Such actions by definition offend the separation of powers.

"There are spheres of activity so fundamental and so necessary to a court, so inherent in its very nature as a court, that to divest it of its absolute command within these spheres is to make meaningless the very phrase *judicial power*."[97] Granted, our Constitution—like the constitutions in many other states—gives the Legislature ultimate authority over setting the rules of court. But there exists "a realm of proceedings which are so vital to the efficient functioning of a court as to be beyond legislative power."[98] This is an area of "minimum functional integrity of the courts, what is essential to the existence, dignity and functions of the court as a constitutional tribunal."[99] The overarching principle seems to be this: "Any statute which moves so far into this realm of judicial affairs as to dictate to a judge how he shall judge or how he shall comport himself in judging or which seeks to surround the act of judging with hampering conditions clearly offends the constitutional scheme of the separation of powers and will be held invalid."[100]

The reason *why* is simple and clear to someone committed to freedom and limited government. It is the principle articulated by Adams, Blackstone, Madison, and Montesquieu: The best way to avoid tyranny and to guarantee the rights and freedom of the people is to keep the powers of the government separate, and to ensure that no single branch ever anoints itself with so much power that it can dominate the other branches and, eventually, the people.

## B. Besides Implicating Separation of Powers Concerns, Section 24(b) Collides with Pragmatic and Principled Concerns, Too.

We have held the Legislature violates the Separation of Powers provision when it thwarts "the functioning of the judicial process in a field constitutionally committed to the control of the courts."[101] The question, again not raised by any of the parties (though the answer seems rather self-evident), is whether a core function of the judiciary is to render judgments and to issue reasoned judicial opinions that clarify the law and help guide the actions of millions of Texans scattered across 254 counties.

Does section 24(b) interfere with our ability to do this by setting an arbitrary deadline for deciding cases? At first blush, it would seem the 120–day deadline impacts the functioning of the judiciary in one of the simplest ways imaginable: by telling us how to manage our own affairs. The Legislature would rightly take exception if this Court, or any court, dictated to them the fine details of how they carry out their oaths of office—prescribing by judicial fiat precisely how our 181 elected legislators ought to legislate. This Court would never contemplate intruding so deeply into the Legislature's internal oper-

---

**96.** *Id.* at 597.

**97.** A. Leo Levin and Anthony G. Amsterdam, *Legislative Control Over Judicial Rule–Making: A Problem in Constitutional Revision,* 107 U. Penn. L.Rev. 1, 30 (1958).

**98.** *Id.* at 31–32.

**99.** *Id.* at 32.

**100.** *Id.*

**101.** *See Betts,* 308 S.W.2d at 851–52.

ations as to commandeer powers that are inherently legislative.

One pragmatic argument against a short-fuse deadline is that 120 days from initial filing may simply not be enough time to render a surpassingly thoughtful and well-reasoned decision. Such adjudicatory work is, undeniably, one of our bread-and-butter core functions. Ours is government of laws, but what use are courts if they cannot give each matter the full attention it requires, to think through every aspect of every relevant question of fact and law, to ensure that the correct outcome (in their opinion, if no one else's) is reached and that their analysis is regarded as exhaustive and scholarly?

Four months—120 days—might seem like plenty of time to decide a case. And no doubt many courts can and should move faster. This Court has commendably erased a backlog that had persisted for years, and we began the current fiscal year on September 1 with the fewest cases held over in recorded history. But the truth is that, generally speaking, 120 days *from initial filing* is rarely enough time for a Supreme Court case to be decided. Procedurally under our rules, there are many, many steps that must occur—*cumulatively taking at least 110 days*—all before the Court even hears oral argument, much less researches and drafts competing opinions and refines them into finished products.

Under our rules, once the petitioner files his petition, the respondent gets 30 days to file a response (though he routinely requests an extension, or two, or more), and the petitioner another 15 days to file a reply to the response (though he, too, often seeks an extension or two).[102] If we then request full briefing, the parties get another 65 days between them to file opening, response, and reply briefs on the merits (again often requesting extensions along the way).[103] That's 110 days already (assuming no extensions have been requested and granted)—and we haven't even agreed to grant the case yet, much less scheduled oral argument (of which parties are usually given a minimum of twenty-one days notice). Then, after oral argument, the Court engages in spirited analysis and discussion of the legal issues. Opinion drafts by the authoring justice, and then any concurring or dissenting opinions, are circulated and conferenced, often many times, before the Court is confident enough with its reasoning and judgment to issue an opinion. And frequently, the more the Court debates the issues, the majority view becomes the minority view, and vice versa, meaning the competing writings have to be converted.

In terms of its statewide budgetary impact (not to mention its jurisprudential impact), this case may be the most consequential of the Term. It thus demands, and deserves, our most meticulous study. Fast-forwarding and vacuum-packing a multi-billion dollar challenge to a major piece of the Texas tax system does a grave disservice not only to the parties involved, but also to the wider public that deserves methodically researched and reasoned Supreme Court rulings to guide their actions. This case may have been filed 120 days ago, but we heard the parties' oral arguments only 35 days ago. Allcat might justifiably wonder whether today's outcome might have been different had the Court taken more time to marinate in these high-stakes questions of law.

One of the ironies of section 24(b) is that such deadlines prejudice the State more than anyone else. Allcat and the other Relators had five years to gird for what

---

102. *See* Tex.R.App. P. 53.7, 56.1.

103. Tex.R.App. P. 55.7.

they knew would be a brief (but pitched) legal battle. The State—specifically, the Attorney General and the Comptroller—had to throw together its arguments under an expedited briefing schedule we were forced to impose.

A pro-State observer might conclude, "No harm, no foul"—after all, the State won. But the State might lose the next expedited case. And who's to say that loss might not be attributable, at least in part, to the very fact that this Court felt obliged to rush to judgment, literally, in order to meet a no-exceptions deadline.

True, a rule mandating faster judicial decisions would ensure faster judicial decisions, but there's often an inverse correlation between faster and better. When parties appear before a court, there is more at stake for them, and for our system of government, than getting a quick answer. Quick answers are, I concede, quick (if nothing else), but the judiciary's legitimacy, and elegance, derive from the fact that judges are expected to *explain* how we reasoned our way to a legal conclusion. Reasoning takes time.[104] So does legislating, which may explain why important matters sometimes fall through the cracks as lawmakers sprint to beat their own 140–day clock.[105]

Every case in this Court deserves painstaking judicial review, whether it involves only a few dollars or, as here, untold billions. But considered review requires consideration. Obviously, urgent matters sometimes arise that require urgent answers—for example, parental-notification cases. Nobody disputes that. But allowing the Legislature free rein to fast-forward select judicial decisions threatens to subvert the quality of those decisions, dilute the judiciary's independence and co-equal status, undermine the vitality of judicial review, and concentrate too much power in the hands of a single branch—precisely what the separation of powers doctrine is designed to combat.[106]

**104.** This dissent would doubtless be at least two-thirds shorter were the Court not sprinting to abide the November 28 deadline.

**105.** *See* Chuck Lindell, *Legislature's Mistake Jeopardizes License Plate Law*, Austin American-Statesman, Nov. 15, 2011, *available at* http://www.statesman.com/news/texas-politics/legislatures-mistake-jeopardizes-license-plate-law-1971446.html (noting that in "the frantic final day of the legislative session," the Legislature "mistakenly omitted the $200 fine for driving a vehicle without license plates, possibly jeopardizing the enforcement of related laws").

**106.** Not too long ago, the Legislature was more attentive to separation of powers concerns, and more inhibited about encroaching on judicial power via mere statute. In 1997, Article V of the Constitution was amended by adding Section 31(d). *See* Tex Const. art. V, § 31(d) (adopted at Nov. 4, 1997 election). That provision states as follows: *"Notwithstanding Section 1, Article II, of this constitution and any other provision of this constitution, if the supreme court does not act on a* motion for rehearing before the 180th day after the date on which the motion is filed, the motion is denied." *Id.* (emphasis added). With this amendment, the Legislature and the voters filled a gap in the Texas Rules of Appellate Procedure—if this Court did not act on a motion for rehearing after denying a petition or after rendering final judgment, that motion was automatically denied. *See id.*

The text alone of this amendment illustrates an important point. Specifically, it indicates that the Legislature thought that enacting such a rule via statute at least implicated the Separation of Powers provision. This may very well explain why the Legislature worded the amendment such that the 180–day rule would apply "[n]otwithstanding Section 1, Article II" of the Constitution—that is, notwithstanding the Separation of Powers provision.

And it's important to note that, when this amendment passed, the Legislature already had the *power* to amend this Court's rules or adopt rules of its own. *See* Tex Const. art. V, §§ 31(a)–(c) (giving the Legislature final authority over the rules governing the judiciary). In fact, it had possessed that power for twelve

Caselaw from other jurisdictions—plus the Court of Criminal Appeals—suggests a host of "where do you draw the line" concerns with section 24(b). As our sister High Court noted in *Armadillo Bail Bonds,* if the law in that case were allowed to stand, then the Legislature had the power to *forever* block a court from entering judgments.[107] Applied to this case, if the Legislature can order the Supreme Court to decide a case within 120 days, why not thirty days, or seven days, or less? There is no principled way to draw such a line. Hence, if the Legislature can mandate *this* deadline, they can mandate *any* deadline, no matter how arbitrary.[108] While our Constitution may give ultimate authority to the Legislature to set the "rules of court," it does not give the Legislature *carte blanche* to encroach upon the judiciary's substantive rights.[109]

In sum, I have reservations over the constitutionality of section 24(b). The Court refrains from addressing the issue, as no party raised it. Perhaps a future case will squarely ask whether the Constitution permits one branch of government to instruct another on core matters in this way.

### III. Conclusion

Spurred by a short fuse of dubious constitutionality, the Court has been harried and hurried into reinventing our mandamus jurisprudence beyond its constitutional and prudential limits. I concur with the Court that we lack jurisdiction over Allcat's as-applied challenge and its request

for attorney fees. From the remainder of the Court's opinion, I respectfully dissent.

---

years. *See id.* So when the Legislature chose to act, it clearly knew it had the authority to create this rule. But it apparently thought the Constitution, specifically the Separation of Powers provision, barred it from doing so *absent a constitutional amendment to the contrary. See id.* art. II, § 1.

**107.** 802 S.W.2d at 241.

**108.** *See Coate,* 662 P.2d at 597.

**109.** *Armadillo Bail Bonds,* 802 S.W.2d at 241.